769 A.2d 427 (2001)
338 N.J. Super. 373
TOWNSHIP OF FRANKLIN, a Municipal Corporation of the State of New Jersey, Plaintiff-Respondent,
v.
David Den HOLLANDER, Garden State Growers, and Quaker Valley Farms, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued January 31, 2001.
Decided March 28, 2001.
*428 Robert P. Merenich, Linwood, argued the cause for appellants (Todd, Gemmel, Todd & Merenich, attorneys; Mr. Merenich, on the brief).
Eric M. Bernstein, Warren, argued the cause for respondent (Mr. Bernstein, of counsel; Susan R. Rubright, on the brief).
Before Judges BAIME, CARCHMAN and LINTNER.
The opinion of the Court was delivered by CARCHMAN, J.A.D.
Following our decision in Villari v. Zoning Board of Adjustment, 277 N.J.Super. 130, 649 A.2d 98 (App.Div.1994), where we held that the Right to Farm Act, N.J.S.A. 4:1C-1 to -10 (amended 1998) (the Act), did not preempt municipal land use authority over commercial farms, the Legislature amended the Act. L. 1998 c. 48 §§ 1-8 (N.J.S.A. 4:1C-1 to -10.4). This appeal requires us to determine whether the amendments to the Act preempt municipal land use jurisdiction over such farms and, more specifically, whether a municipality may require a commercial farmer to comply with local land use ordinances including site plan approval. We conclude there is preemption, and that primary jurisdiction to regulate agricultural management practices rests with the County Agricultural Board (CAB) or the *429 State Agricultural Development Committee (SADC). We further hold that in fulfilling their responsibility to regulate agricultural management practices under the Act, both the CAB and the SADC must consider the impact of such practices on municipalities and, in so doing, consider the limitations imposed by local land use and zoning ordinances adopted pursuant to the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -112. We conclude that on remand to the CAB, the CAB, exercising primary jurisdiction, must first determine whether defendant's activities fall within the purview of "agricultural management practices." If so, upon assuming jurisdiction, the CAB, or SADC, where appropriate, must consider not only the impact of such practices on the municipality, but the standards established by local ordinances, all within the scope of the agency's statutory obligation to consider public health and safety. If the CAB or SADC determines that the proposed activity falls outside of the scope of agricultural management practices, jurisdiction then resides with the municipality and its appropriate agencies to enforce its local land use and other relevant ordinances.[1]

I.

A.
We address this issue in the following factual and procedural context. Defendants David den Hollander, Garden State Growers and Quaker Valley Farms collectively own 143 acres in Franklin Township, Hunterdon County. The property is zoned AR-7, Agricultural-Residential, which permits agricultural uses. One-hundred and nineteen acres of the property are subject to a Deed of Easement benefitting the Hunterdon County Agricultural Development Board and/or the New Jersey State Agricultural Development Committee.
Defendants operate a large-scale ornamental plant production operation that employs 150 workers, and have installed concrete sidewalks, gravel and paved areas, plastic impervious ground cover, storm water control structures, and greenhouses called "hoop houses." The hoop houses are constructed of steel pipe frames, wood, and plastic, and are approximately 14 feet wide, 200 feet long, and 6 feet 6 inches high at the center of the arch. They average 2800 square feet in size. Defendants' characterization of these structures as temporary is disputed by plaintiff Township of Franklin, which notes that the structures have remained in place since their construction in the mid-1980's.
On April 16, 1998, plaintiff filed a multi-count complaint in the Law Division, Hunterdon County, against defendants seeking declaratory relief and related permanent injunctive relief. We will summarize plaintiff's allegations. Specifically, plaintiff alleged that defendants were in violation of provisions of their Deed of Easement and unspecified township regulations, and that "[d]efendants' failure to comply with the Deed of Easement and/or [regulations constituted] a nuisance adversely affecting the health, safety and welfare of the residents of the Township." Defendants failed to conform their agricultural practices to those recommended by the SADC, and to "relevant federal or State statutes or rules and regulations which as a consequence pose[d] a direct threat to the public health, safety and welfare."
*430 Defendants built structures on the property without receiving approval from the appropriate township agencies, and "continued to threaten to use said structures in derogation of lawful rules and regulations of the Township."
Defendants "created a trucking terminal in a residential district of the Township... [and] parking areas on site for non-passenger vehicles without site plan approval," and permitted trucks to park on land adjacent to the property, creating an inappropriate impact on adjoining residential properties. The noise created by the trucks disrupted the "peace and tranquility of the adjoining residential neighborhood."
Defendants had "not complied with Federal regulations regarding ascertaining the qualification" of the workers employed on the property, noting that defendants allowed the workers to "avoid using designated approved sanitary facilities" and that the workers "perform[ed] individual waste disposal function in public view." Such activity, plaintiff claimed, violated sanitary codes of various agencies and criminal statutes of the State of New Jersey, and created a health hazard "both to other workers and the public in general." Furthermore, defendants failed to obtain the necessary prior approval before employing more than twenty-five employees.
Next, defendants expanded their use of the property in derogation of the limits set forth on the site plan and without proper approval, and that defendants were bound as successors in interest to a compliance agreement with the Hunterdon County Soil Conservation District which contained a Farm Conservation Plan. Defendants installed impervious surfaces without approval and in violation of township ordinances.
Attached to plaintiff's complaint was the certification of Linda Peterson, a civil engineer employed by the United States Department of Agriculture Natural Resources Conservation Service (USDA-NRCS), which had been submitted by the plaintiff in Hunterdon County Soil Conservation District v. den Hollander, C-14007-97, aff'd, Nos. A-6650-96, A-4028-97 (App. Div. Feb 23, 1999). Peterson stated that most of defendants' property is devoted to permanent greenhouse production and processing, that "the cultural methods employed by [defendants] results in an extremely high percentage of impervious area," and that the "impervious areas drastically increase runoff which may cause excessive soil erosion, off-site damage, and the degradation of water quality." Peterson further noted that defendants failed to maintain a detention basin system to control runoff from the hoop houses. She observed that the basin area was used for parking and storage, that concrete lanes were constructed around the large production blocks in the mum fields, and that "uncontrolled runoff from the field deposits sediment at the lower edge of the field before concentrating into unstable channels." The gullies, she explained, "outlet the runoff through the woods and eventually into Lockatong Creek." She further stated that defendants never completed or stabilized soil erosion and sediment control measures that were recommended by USDA-NRCS to divert runoff around the mum field, resulting in severe erosion delivering a significant amount of sediment into the creek. Finally, Peterson opined that "[a] USDA-NRCS Farm Conservation Plan, if properly installed and maintained, would address both water quantity and ... quality issues" at the farm.
Plaintiff also submitted the certification of Tony M. Ganguzza, Municipal and Planning Board Engineer for the Township of Franklin, detailing extensive alleged violations of various land use and zoning ordinances. *431 We briefly identify those sections of plaintiff's township land use ordinances identified as relevant to the issues before us, and then summarize Ganguzza's allegations. Section 118-40A(1)(b)[7] of the township code provides that site plan approval is required for the construction of farm structures in excess of 7% of the land area, or of any farm structure greater than 20,000 square feet. Franklin, N.J., Code § 118-40A(1)(b)[7]. Section 85-4 defines farm structures as "[a]ny and all farm structures, for example, barns, silos, food storage structures, greenhouses, processing structures, machinery or utility storage structures, watering and livestock buildings and roadside stands." Id. at § 85-4. Section 85-21 requires that no building or structure be constructed until a building permit has been procured by filing an application in accordance with the construction code of the township, id. at § 85-21A, which also limits impervious coverage of a lot in the AR-7.0 Agricultural Residential Zone to 10%.
Ganguzza stated that defendants failed to build two retention ponds essential to surface water management and that the absence of the ponds suggested violations of local ordinances and a June 10, 1996 order of the Law Division which permitted defendants to improve the property in accordance with the Site Plan and Site Grading Plan (Site Plan). Based on aerial photographs, Ganguzza concluded that the area where Pond 1 was to be located was instead an open area, and that the area designated for Pond 2 was instead used for truck and trailer parking. There was no planning board review or approval for those deviations from the Site Plan, nor was there approval of the installation of a parking area as required by municipal ordinances. The Site Plan provided for 76 parking spaces in three designated areas only. In addition to the unapproved parking in the area of Pond 2, truck parking also occurred along the southerly side of a "proposed greenhouse" for which no approval was obtained as required by local ordinance. Defendants also had not obtained approval for three greenhouses and a truck parking area located in Block 37, Lot 42, which together comprised approximately 28 acres of farm structures on that 119 acre section. These improvements were constructed contrary to the 7% limitation provided by Section 118-40.A(1)(b)[7], which would only permit up to 8.4 acres of farm structures without prior approval. These structures included hoop houses, barns, and associated structures. Assuming that the hoop houses are impervious surfaces as well as structures, the lot coverage substantially exceeded the 10% maximum impervious surface ratio. Sixty-five percent of the mum field was covered by impervious material, including concrete walkways and gravel-filled areas, also in violation of the 10% coverage maximum. The concrete walkways were approximately 10 to 12 feet wide and large vehicles were parked at the corners. Walkways of that width were not intended for pedestrian traffic, but rather for an internal transportation system using those vehicles. Ganguzza calculated that these walkways and gravel-filled areas exceeded 53,000 square feet of impervious coverage, or more than ten times the minimum soil disturbance threshold permitted without approval under Sections 112-1 and 118-40.
Ganguzza also stated that the soil erosion and sediment control plan (RT plan) submitted by defendants was not credible and was contradicted by aerial photographs. For example, the RT plan identified the area designated as Pond 2 on the Site Plan as "Basin # 2." This designated use was inconsistent with the photographs indicating that the Pond 2 area was actually being used for truck parking. Furthermore, there was a notation on the RT plan *432 for a "Berm to be Extended" which was contradicted by a photograph demonstrating that the existing berm lies between "Hoop Greenhouse 2" and the Pond 2 parking area, making extension of the berm impossible. Based on another aerial photograph, Ganguzza concluded that the RT plan also failed to account for the demolition of buildings which had been situated south of Field 2, and that defendants had not obtained a permit for that demolition or for attendant regrading and restoration of the area. The RT plan also identified an "Irrigation Pond" to the west of Field 4 and an "Extended Detention Basin 3" in the northwest corner of Field 6 which would have required approval. Ganguzza observed that the area designated as "Basin 3" was actually being used for truck parking.
Ganguzza further observed that the RT plan revealed a need for proper soil detention on defendants' property, as Fields 4 and 6 were located along either side of Lockatong Creek, which also flows along the southern boundary of defendants' mum field and across the southeast corner of Field 2, and a new gravel road connecting Fields 2 and 6 had been constructed by traversing the creek.
Ganguzza concluded based on "usual and customarily accepted engineering standards," that defendants' violations of the township's ordinances and their deviations from the Site Plan posed an immediate threat to the health, safety, and welfare of township residents due to defendants' unregulated and unapproved structures and uses. He attributed the surface water flow problems to defendants' building and construction, and opined that the "Lockatong Creek and its associated corridor have been and remain in jeopardy of ongoing degradation." He also opined that the absence of previously approved water quality structures indicated that improperly treated or untreated water was flowing both on- and off-site, and that the truck parking area compounded the problem. Ganguzza urged that necessary remedies might include the removal of some of the structures and relocation of others, and would require re-establishment of previously required water quality features.

B.
After the issues were joined by the pleadings, defendants filed a motion to transfer the proceedings from the trial court to the Hunterdon County Agricultural Development Board on the ground that the trial court lacked subject matter jurisdiction. Defendants argued that the Act preempted the MLUL and accompanying local zoning and land use regulations.
The trial judge denied defendants' application. Although the judge found for purposes of the motion that defendants' operation was a commercial farm operation as defined by the Act, he disagreed with defendants' interpretation of the meaning and significance of the Act as amended and the administrative regulations. The judge concluded that the post-Villari amendments to the Act did not preempt the court's jurisdiction to consider "[p]ure zoning and site plan issues." He further opined that a judge would make an appropriate determination of which issues were properly before the court and which were within the jurisdiction of the CAB. We granted leave to appeal from his interlocutory order, and now reverse.
The parties' arguments on appeal are simply stated. Defendants claim that the amended Act preempts the MLUL by conditionally restricting application of municipal regulation of agricultural activities.[2] *433 Defendants argue that the Act and attendant regulations require that disputes involving commercial farm operations be resolved by the designated agricultural board rather than a trial court. Defendants further argue that although Villari remains "good law," the amended Act mandates a new and different analysis of the issue presented. Plaintiff agrees with the trial judge that the issues are severable and "pure zoning and land use issues" are not preempted.

II.
The Act represents a legislative determination "to promote, to the greatest extent practicable and feasible, the continuation of agriculture in the State of New Jersey while recognizing the potential conflicts among all lawful activities in the State." Senate Natural Resources and Agriculture Committee, Statement to S. 854 (L. 1983, c. 31). Among its other stated purposes, the Act is intended to protect commercial farm operations from nuisance actions. N.J.S.A. 4:1C-2(e). The Act and similar enactments in virtually every other jurisdiction,[3] "protect working lands from the encroachment of residential development," and "were created to address a growing concern that too much farmland was being overtaken by urban sprawl" as a result of nuisance suits which "frustrated farming operations and encouraged farmers to sell to developers." Jesse L. Richardson, Jr. & Theodore A. Feitshans, Nuisance Revisited After Buchanan and Bormann, 5 Drake J. Agric. L. 121, 127-28 (2000).
The Act and the proliferation of other similar statutes nationwide revealed an obvious tension between the rights of farmers with land protected by such provisions and local governments which perceived a need to protect those outside of the scope of such acts. This tension was observed by a commentator as early as 1984:
Local ordinances pose a much more serious threat than do state laws to the effective operation of the right-to-farm statutes. The shift in local political power occurring when suburbanites move into an agricultural district often leads to the passage of local ordinances limiting various farm activities.... Insulation from such ordinances is an important component of an effective right-to-farm statute. A state legislature that defers to the local government in this manner effectively nullifies its policy choice of preferring agricultural activities over other conflicting land uses.... [T]he value of an explicit preemption of local statutes and ordinances lies in its ability to discourage local governments from passing limiting regulations and to give the farmer a sense of security against attempted limitations of his/her operations.
[Jacqueline P. Hand, Right-to-Farm Laws: Breaking New Ground in the Preservation of Farmland, 45 U. Pitt. L.Rev. 289, 322-23 (1984) (footnotes omitted).]
In Villari, supra, 277 N.J.Super. 130, 649 A.2d 98, we confronted the issue of the relationship between the Act and local ordinances enabled by the MLUL. We held that the Act did not preempt or override the powers conferred upon municipal governments by the MLUL. Id. at 134, 649 A.2d 98. We concluded that the Act failed *434 to evince an explicit legislative intent to override a municipality's authority to zone all property located within its boundaries, observing that the Act failed to even mention the MLUL. Id. at 138-39, 649 A.2d 98.
Because the Act did not expressly override the MLUL, we explored, but rejected, repeal of the MLUL by implication. Id. at 139, 649 A.2d 98. We reasoned that the Act could preempt municipal zoning ordinances only if it impliedly repealed that part of the MLUL which confers comprehensive zoning power upon municipalities. Ibid. In finding there was no clear and compelling demonstration of legislative intent to repeal the MLUL by implication, we noted the strong presumption against implied repealers, and concluded there was no "clear and compelling evidence of a legislative intent to displace municipal power over zoning insofar as it applies to commercial agricultural uses." Ibid. (citing Township of Mahwah v. Bergen County Bd. of Taxation, 98 N.J. 268, 281, 486 A.2d 818, cert. denied sub nom. Borough of Demarest v. Township of Mahwah, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985)). We examined legislative practices in delegating zoning power to other governmental entities, such as the Hackensack Meadowlands Development Commission and the New Jersey Building Authority, and noted that in those cases, the Legislature clearly and expressly exempted certain properties from municipal zoning. Id. at 139-40, 649 A.2d 98 (discussing the Hackensack Meadowlands Reclamation and Development Act, N.J.S.A. 13:17-1 to -86, and the New Jersey Building Authority Act, N.J.S.A. 52:18A-78.1 to -78.32). Thus, we concluded, "[i]f the Legislature had intended commercial agricultural uses to enjoy a comparable exemption from municipal zoning, it would undoubtedly have expressed that intent with equal clarity, especially since such an exemption would have a potentially far-reaching impact upon municipal land use control." Id. at 140, 649 A.2d 98.
Subsequent to our decision in Villari, the Legislature amended the Act[4] to read, in pertinent part:
Notwithstanding the provisions of any municipal or county ordinance, resolution, or regulation to the contrary, the owner or operator of a commercial farm, located in an area in which, as of December 31, 1997 or thereafter, agriculture is a permitted use under the municipal zoning ordinance and is consistent with the municipal master plan, or which commercial farm is in operation as of the effective date of P.L.1998, c. 48 (C.4:1C-3 et al.), and the operation of which conforms to agricultural management practices recommended by the committee and adopted pursuant to the provisions of the "Administrative Procedure Act," P.L.1968, c. 410 (C.52:14B-1 et seq.), or whose specific operation or practice has been determined by the appropriate county board, or in a county where no county board exists, the committee, to constitute a generally accepted agricultural operation or practice, and all relevant federal or State statutes or rules and regulations adopted pursuant thereto, and which does not pose a *435 direct threat to public health and safety may:
a. Produce agricultural and horticultural crops, trees and forest products, livestock, and poultry and other commodities as described in the Standard Industrial Classification for agriculture, forestry, fishing and trapping;
b. Process and package the agricultural output of the commercial farm;
c. Provide for the operation of a farm market, including the construction of building and parking areas in conformance with municipal standards;
d. Replenish soil nutrients and improve soil tilth;
e. Control pests, predators and diseases of plants and animals;
f. Clear woodlands using open burning and other techniques, install and maintain vegetative and terrain alterations and other physical facilities for water and soil conservation and surface water control in wetland areas;
g. Conduct on-site disposal of organic agricultural wastes;
h. Conduct agricultural-related educational and farm-based recreational activities provided that the activities are related to marketing the agricultural or horticultural output of the commercial farm; and
i. Engage in any other agricultural activity as determined by the State Agriculture Development Committee and adopted by rule or regulation pursuant to the provisions of the "Administrative Procedure Act," P.L.1968, c. 410 (C.52:14B-1 et seq.).

[N.J.S.A. 4:1C-9.]
The revised Act further provides that
[i]n all relevant actions filed subsequent to the effective date of P.L.1998, c. 48 (C.4:1C-3 et al.), there shall exist an irrebuttable presumption that no commercial agricultural operation, activity or structure which conforms to agricultural management practices recommended by the committee and adopted pursuant to the provisions of the "Administrative Procedure Act," P.L.1968, c. 410 (C.52:14B-1 et seq.), or whose specific operation or practice has been determined by the appropriate county board, or in a county where no county board exists, the committee, to constitute a generally accepted agricultural operation or practice, and all relevant federal or State statutes or rules and regulations adopted pursuant thereto and which does not pose a direct threat to public health and safety, shall constitute a public or private nuisance, nor shall any such operation, activity or structure be deemed to otherwise invade or interfere with the use and enjoyment of any other land or property.

[N.J.S.A. 4:1C-10.]
The committee statement attached to the bill is helpful in discerning the legislative intent of the amendments. See, e.g., Cox v. Cox, 335 N.J.Super. 465, 477-78, 762 A.2d 1040 (App.Div.2000) (noting that "legislative history and sponsor statements... provid[e] important insight into the Legislature's intent and [a] statute's overall policy and purpose") (internal quotations marks omitted). According to the statement, the amendments were intended, in part, to:
expand the list of agricultural activities that would preempt county or municipal regulation if they are conducted in a manner that does not pose a direct threat to public health and safety.
[Assembly Agricultural and Natural Resources Committee, Statement to A.2014 (June 4, 1998).]
Before we address the merits of whether the amendments demonstrate the required *436 intent to preempt the MLUL, we also examine the relevant provisions of that statute in the context of the issue before us.
The stated legislative purpose of the MLUL is, in part, "[t]o encourage municipal action to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare." N.J.S.A. 40:55D-2. The MLUL enables and defines the limits of a municipality's procedural and substantive power to regulate land development within its borders. See N.J.S.A. 40:55D-62a. Specifically, the MLUL provides that the municipal governing body
shall enforce this act and any ordinance or regulation made and adopted hereunder. To that end, the governing body may require the issuance of specified permits, certificates or authorizations as a condition precedent to (1) the erection, construction, alteration, repair, remodeling, conversion, removal or destruction of any building or structure, (2) the use or occupancy of any building, structure or land.... In case any building or structure is erected, constructed, altered, repaired, converted, or maintained, or any building, structure or land is used in violation of this act or of any ordinance or other regulation made under authority conferred hereby, the proper local authorities of the municipality or an interested party, in addition to other remedies, may institute any appropriate action or proceedings to prevent such unlawful erection, construction, reconstruction, alteration, repair, conversion, maintenance or use, to restrain, correct or abate such violation, to prevent the occupancy of said building, structure or land, or to prevent any illegal act, conduct, business or use in or about such premises.

[N.J.S.A. 40:55D-18.]
The MLUL further provides that a municipal planning board "shall follow the provisions of this act and shall accordingly exercise its power in regard to ... [s]ubdivision control and site plan review pursuant to article 6 [N.J.S.A. 40:55D-37 to -59]." N.J.S.A. 40:55D-25a(2). In addition, the municipal governing body "may adopt or amend a zoning ordinance relating to the nature and extent of the uses of land and of buildings and structures thereon." N.J.S.A. 40:55D-62a. According to the MLUL, a zoning ordinance may:
a. Limit and restrict buildings and structures to specified districts and regulate buildings and structures according to their type and the nature and extent of their use, and regulate the nature and extent of the use of land for trade, industry, residence, open space or other purposes.
b. Regulate the bulk, height, number of stories, orientation, and size of building and the other structures; the percentage of lot or development area that may be occupied by structures; lot sizes and dimensions; and for these purposes may specify floor area ratios and other ratios and regulatory techniques governing the intensity of land use and the provision of adequate light and air, including, but not limited to the potential for utilization of renewable energy sources.
....
d. Establish, for particular uses or classes of uses, reasonable standards of performance and standards for the provision of adequate physical improvements including, but not limited to, off-street parking and loading areas, marginal access roads and roadways, other circulation facilities and water, sewerage and drainage facilities; provided that *437 section 41 of this act [N.J.S.A. 40:55D-53] shall apply to such improvements.

[N.J.S.A. 40:55D-65a, b, d.]
Common to both the Act and the MLUL is the overriding focus on "public health and safety." However, in the former, the standard provides a basis for limiting municipal authority, while in the latter, the standard provides the enabling authority for local regulation.

III.
Against this factual, procedural and statutory backdrop, we address the issue of preemption. Preemption is a judicially created principle based, in part, on the proposition that a municipality, as an agent of the State, cannot take action contrary to the State. Summer v. Township of Teaneck, 53 N.J. 548, 554, 251 A.2d 761 (1969). A municipality, therefore, may not contradict a policy established by the Legislature. Ibid.; Auto-Rite Supply Co. v. Mayor of Woodbridge, 25 N.J. 188, 194, 135 A.2d 515 (1957). "Hence an ordinance will fail if it permits what a statute expressly forbids or forbids what a statute expressly authorizes." Summer, supra, 53 N.J. at 554, 251 A.2d 761 (emphasis added).
It is indisputable that the doctrine of preemption may apply to local zoning ordinances. See e.g., Township of Chester v. Dep't of Envtl. Prot., 181 N.J.Super. 445, 453, 438 A.2d 334 (App.Div.1981) (Solid Waste Management Act preempted township's zoning ordinance with respect to construction of access road to landfill); Township of Little Falls v. Bardin, 173 N.J.Super. 397, 415-18, 414 A.2d 559 (App. Div.1979) (Solid Waste Management Act preempted township's zoning ordinance under which a sanitary landfill was a nonpermitted use). Just as the State grants and enables municipalities' power to zone pursuant to the MLUL, it can also limit that power. As the Supreme Court observed in Lusardi v. Curtis Point Property Owners Ass'n, 86 N.J. 217, 430 A.2d 881 (1981):
[s]tatewide policies are relevant to zoning decisions because municipalities exercise zoning power only through delegation of the State's authority and they must consider the welfare of all of the State's citizens, not just the interests of the inhabitants in the particular locality.
[Id. at 227, 430 A.2d 881.]
The doctrine of preemption has also been applied to municipalities' planning and site plan approval authority. For example, we have held that the Solid Waste Management Act preempts any local requirements that the operator of a sludge management and recovery facility comply with a municipal site plan or obtain variance approval. Ocean County Utils. Auth. v. Planning Bd. of Berkeley, 223 N.J.Super. 461, 538 A.2d 1307 (App.Div.1988).
Guiding our analysis is the basic tenet that legislative intent to override or preempt existing legislation, especially that favoring local authority, must be clearly present. See Summer, supra, 53 N.J. at 554, 251 A.2d 761; Kennedy v. City of Newark, 29 N.J. 178, 187, 148 A.2d 473 (1959). The structure of the amended Act provides insight into resolution of the issue. The amended Act explicitly preempts municipal regulation of various commercial agricultural activities which meet certain eligibility criteria. N.J.S.A. 4:1C-9. Specifically, all of the activities listed in N.J.S.A. 4:1C-9(a) through (h) are to be allowed "[n]otwithstanding the provisions of any municipal or county ordinance, resolution, or regulation to the contrary," provided they are in accordance with a "generally accepted agricultural operation or practice" as determined by the SADC. N.J.S.A. 4:1C-9.
*438 The amended Act also expanded upon and formalized the procedure by which farming operations involving the activities listed in N.J.S.A. 4:1C-9(a) through (h) may be deemed "to constitute a generally accepted agricultural operation or practice." Id. Whereas the pre-amendment Act simply identified an "acceptable agricultural operation or practice" as one which "conforms to agricultural management practices recommended by the [SADC]," N.J.S.A. 4:1C-9 (amended 1998) (emphasis added), the amended Act sets forth specific procedures for determining whether agricultural operations are entitled to the protections of the Act. First, the amended Act authorizes the SADC to define accepted agricultural management practices through a formal rulemaking process. N.J.S.A. 4:1C-9. Where no rules exist, site-specific practices can be approved on a case-by-case basis by the CAB, or, where no such board exists, by the SADC. Id. Where a CAB recommends a site-specific agricultural management practice, an appeal can be taken to the SADC. N.J.S.A. 4:1C-10.2.
We find further support for preemption by noting that in Villari, supra, we observed that among other examples of explicit preemption, the preemptive language in the New Jersey Building Authority Act, N.J.S.A. 52:18A-78.1 to -78.32, demonstrated the clear intent necessary to establish preemption. 277 N.J.Super. at 140, 649 A.2d 98. By that Act, the Building Authority was allowed to "determine the `location, type and character' of buildings to be used by State agencies `notwithstanding any land use plan [or] zoning regulation ... adopted by any municipality.'" Ibid. (quoting N.J.S.A. 52:18A-78.5(u)). Although the language of the amended Act may not be as explicit, it is clearly broader in scope by allowing approved agricultural uses "[n]otwithstanding the provisions of any municipal or county ordinance, resolution, or regulation to the contrary." We conclude that the amendatory language demonstrates specific legislative intent to preempt. N.J.S.A. 4:1C-9.
A finding of facial preemption does not end our inquiry. We also note that the Act defines specific matters for consideration by the CAB and SADC. It is only within those statutory parameters that the agencies may assume and exercise jurisdiction; in doing so, they must also exercise discretion in a manner consistent with their charge. As such, they must act in a manner which gives appropriate consideration not only to the agricultural practice at issue, but to local ordinances and regulations as well, including land use regulations which may impact on the agricultural practice. It is not difficult to envision a scenario, as suggested by plaintiff here, where a commercial farm operator may seek to extend what appears to be an accepted agricultural management practice to such an extent that it is so violative of local land use ordinances as to be beyond the ken of reasonable conduct despite falling within the scope of the Act. In such instances, the CAB or SADC cannot disregard such ordinances and the impact of agricultural management practices in such context.
Our courts have acknowledged analogous obligations in other circumstances. See, e.g., Holgate Prop. Assocs. v. Township of Howell, 145 N.J. 590, 601, 679 A.2d 613 (1996) (noting the administrative agency's implied duty to consider local zoning and land use regulations even where there was preemption under the Solid Waste Management Act). In Garden State Farms, Inc. v. Bay, 77 N.J. 439, 390 A.2d 1177 (1978), the Court addressed a similar issue in the context of a heliport facility *439 and specifically examined the relevance of local land use ordinances:
Especially probative of the vital interests of local government is the municipal zoning ordinance itself. Indeed, the Commissioner by regulation already recognizes the importance of such interests by giving controlling weight to local ordinances in the case of applications for public use airports and private landing strips. N.J.A.C. 16:54-1 et seq.; N.J.A.C. 16:54-2 et seq. See also Aviation Services v. Bd. of Adj. of Hanover Twp., 20 N.J. 275, 285, 119 A.2d 761 (1956); Town of Bloomfield v. New Jersey Highway Auth., 18 N.J. 237, 248, 113 A.2d 658 (1955). Clearly he should, at the very least, acknowledge the relevance of the local zoning ordinance with respect to applications for private heliports and helistops. To this we would add as a material consideration that the Commissioner ought to take into account whether an applicant for a private heliport has availed itself of any right to a variance under the local zoning law and whether an application for a variance should be pursued as a helpful procedure for fleshing out the impact of the proposed facility upon neighboring uses.
[Id. at 455, 390 A.2d 1177.]
The Court observed that "a failure on the Commissioner's part to weigh conscientiously local interests, to examine carefully whether the proposed avigation facility is compatible with the surrounding land uses and to consult the local ordinances and authorities in making its licensing decision would constitute an abuse of discretion." Id. at 456, 390 A.2d 1177. See also Cox, New Jersey Zoning and Land Use Administration, §§ 21-3 to -32.2 (2000). There may be instances where a CAB or the SADC concludes that an issue is beyond the jurisdiction of the agency, that adherence to local land use ordinances is appropriate, or even that there is no preemption on a specific issue, cf. Shupack v. Manasquan River Reg'l Sewerage Auth., 194 N.J.Super. 199, 205, 476 A.2d 816 (App.Div.1984); however, that determination shall be made by the CAB or SADC in the first instance, rather than by the municipality or a court.
While we recognize that the preemption doctrine may appear to give expansive and unlimited jurisdiction over agricultural practices to the CAB or SADC, we conclude that the legislative imperative requiring attention to public health and safety also imposes a limitation on such jurisdiction and requires the respective boards to consider the impact of municipal land use ordinances. When assessing the nature of defendants' various farm structures, land coverage, and other related matters, the use of such structures and coverage may properly be considered relevant agricultural management practices, but the impact of those practices on, for example, water run-off, stream encroachment, and the creation of impervious areas may also directly impact on public health and safety so as to compel the CAB or SADC to temper its determinations with these standards in mind. By including the issue of public health and safety as a limitation on the scope of the Act, the Legislature demonstrated an intent to impose on the CAB and SADC an obligation to consider these factors in all contexts, including relevant local land use ordinances. For example, while concrete walkways and gravel filled parking areas may fall within the statutory rubric of agricultural management practices, the CAB must consider the extent of their use and consider the limitations imposed on such uses by a municipality. We recognize that while the municipal limitations imposed on such practices may be more restrictive than those required to satisfy the standards of legitimate agricultural *440 practices, the municipal limitations may nevertheless provide an appropriate measure for consideration by the CAB or SADC. To reiterate, an initial determination must be made by the agency as to whether an agricultural management practice is involved, and having determined that a subject practice is at issue, the CAB or SADC must then consider relevant municipal standards in rendering its ultimate decision.
Aside from the agency's duty to consider local ordinances in general, advocacy of an aggrieved party's, including a municipality's, position on a given issue is further protected by the statute. N.J.S.A. 4:1C-10.1a provides that "[a]ny person aggrieved by the operation of a commercial farm shall file a complaint with the applicable [CAB] or the [SADC] in counties where no county board exists prior to filing an action in court." The statute provides for an appropriate hearing to determine, among other things, whether the activity in question "constitutes a generally accepted agricultural operation or practice." N.J.S.A. 4:1C-10.1(c). See also N.J.A.C. 2:76-2.10 (establishing the hearing procedure for those aggrieved by the operation of a commercial farm). Following an adverse determination, an aggrieved party may then appeal to the SADC, N.J.S.A. 4:1C-10.2, and then to this court for further review, R. 2:2-3(a)(2).
The explicit legislative purpose of the MLUL is, in part, "[t]o encourage municipal action to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare." N.J.S.A. 40:55D-2a (emphasis added). Land use ordinances provide an appropriate exercise of legislative authority to promote public health and safety. See, e.g., State v. C.I.B. Int'l, 83 N.J. 262, 270-72, 416 A.2d 362 (1980) (holding that requiring issuance of certificate of occupancy upon change in tenancy of existing dwelling was an appropriate municipal measure to insure public safety); Cappture Realty Corp. v. Bd. of Adj. of Elmwood Park, 133 N.J.Super. 216, 224, 336 A.2d 30 (App.Div.1975) (holding that an ordinance may forbid uses which create odor, dust, noise, smoke or gas). See also, e.g., N.J.S.A. 40:55D-38 (setting forth appropriate considerations for subdivision or site plan approval including protection against flooding, water pollution, and other issues of public health and safety.) We consider that the statutory language in the Act which speaks to conduct that poses a "direct threat to public health or safety" must be considered broadly, and not as a narrow limitation in considering complaints of an aggrieved party that local land use or other relevant ordinances are being violated by the conduct of the commercial farm operator. In sum, in exercising its authority under the Act, the CAB or SADC must afford a local agency comity in recognition that the municipality interests must be appropriately acknowledged and considered.
Applying these standards to this case, we recognize that the expansive complaint filed by plaintiff may indeed address legitimate agricultural management practices and may also address issues beyond the jurisdiction of the CAB. We need not focus on the specific allegations or the jurisdictional implications of such allegations except to reiterate that the CAB shall determine in the first instance whether and to what extent its jurisdiction extends to such allegations. If the CAB assumes jurisdiction, it must determine, among other things, whether the practices at issue present a "direct threat to public health and safety." By such consideration, the agency *441 must harmonize the policy considerations which mandate protection for the State's agricultural industry with the important and well-recognized local control of land use development. Any relief sought by plaintiff in this matter must first be addressed to the CAB.
Reversed and remanded for proceedings consistent with this opinion.
NOTES
[1] While we address the issues in this appeal in the context of preemption, we recognize that principles of primary jurisdiction and harmonizing the provisions of the Act and the MLUL are necessarily implicated. We have considered those principles as well, and intend that our use of the term "preemption" be understood in its broadest sense, and our decision read accordingly. Under any of these theories, the results would be the same.
[2] Defendants claim the Act "conditionally" restricts municipal zoning because the Act specifically requires buildings and parking areas associated with a farm market on commercial farm property to comply with municipal standards. N.J.S.A. 4:1C-9(c).
[3] For a compilation of the various other state statutes and citations, see Alexander A. Reinert, The Right to Farm: Hog-Tied and Nuisance-Bound, 73 N.Y.U. L.Rev. 1694, 1706 n. 76 (1998).
[4] Prior to the 1998 revisions, the Act provided:

The owner or operator of a commercial farm which meets the eligibility criteria for differential property taxation pursuant to the "Farmland Assessment Act of 1964," P.L.1964, c. 48 (C.54:4-23.1 et seq.) and the operation of which conforms to agricultural management practices recommended by the committee and all relevant federal or State statutes or rules and regulations adopted pursuant thereto and which does not pose a direct threat to public health and safety may:
[N.J.S.A. 4:1C-9 (1983).]