839 A.2d 110 (2004)
365 N.J. Super. 338
BOROUGH OF CLOSTER, Plaintiff-Respondent,
v.
ABRAM DEMAREE HOMESTEAD, INC., Defendant-Appellant, and
Frank W. Koestner, Paul Nigito and F. William Koester, Jr. and Conrail, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued November 18, 2003.
Decided January 14, 2004.
*111 Frank Rivellini, Hackensack, argued the cause for appellant (Francis J. DeVito, attorneys; Mr. Rivellini, on the brief).
Michael J. Breslin, Jr. argued the cause for respondent (Waters, McPherson, McNeill, attorneys; Mr. Breslin, on the brief).
*112 Before Judges A.A. RODRÍGUEZ, LEFELT and PAYNE.
The opinion of the court was delivered by LEFELT, J.A.D.
In an action brought by the plaintiff Borough of Closter, the trial judge found that defendant Abram Demaree Homestead, Inc. had created a nuisance by interfering with the flow of surface water and directed defendant to remove soil that it had, several years before, added to its farm allegedly to prevent flooding from storm water runoff. Defendant appeals, claiming that the court lacked jurisdiction to direct the farm to remove the soil and, in the alternative, that the court made various trial errors. We conclude that the County Agricultural Board (CAB) under the Right to Farm Act, N.J.S.A. 4:1C-1 to 4:1C-10.4 (Farm Act), has primary jurisdiction to address the alleged agricultural management practices in this case and that defendant, by defending its actions in court, has not waived its right to a primary determination by the CAB. Consequently, we vacate the court's orders and remand to the Law Division with a direction to transfer several issues to the CAB.

I.
Defendant operates a fourteen-acre farm on land, located within the borough boundaries of plaintiff Closter, that defendant had purchased from the Hackensack Water Company in 1992. The land has been continuously farmed for over 200 years by various entities. The farm is a non-profit charitable operation, which is assessed for tax purposes as farmland, and is "the largest provider of fresh organically grown vegetable[s] in the State of New Jersey. All farm production is totally donated and feed[s] the area's poor and sustain[s] the farm operations."
The property is shaped roughly as a rectangle and has lower elevation than all of the surrounding properties. When defendant purchased the property, its deed contained two sewer easements. The first was a seventeen-foot wide Bergen County Utilities Authority easement. The second was a fifteen-foot wide Borough of Closter easement. Both sewer easements run parallel and adjacent to each other along the westerly border of the farm. The Borough easement contains raised manholes sitting atop concrete encasements jutting out of the ground about four to five feet above the ground. Hackensack Water had granted this easement to the Borough with the understanding that it intended "to use the subject property including the surface of the easement area, for landfill purposes." Both the Borough and County sewer easements are underground systems that do not carry storm water.
The easterly and northerly borders of the farm abut roads. The westerly border, containing the two sewer easements, abuts property owned by CFX (formerly Conrail) railroad, containing railroad tracks. United Water Company, the successor to the Hackensack Water Company, owns the land to the west of the railroad tracks. The water company's reservoir is located several hundred feet west of the railroad tracks. The southerly border of the farm abuts Lot 2, which contains a commercial building.
Lot 2 abuts Durie Estates. In 1989, Durie Estates obtained subdivision approval to develop its 14.8 acres of land into 23 lots for the construction of single-family homes. By the time of this dispute, Durie Estates had been fully developed.
There are two culverts located under the railroad embankment. A southerly culvert abuts Durie Estates and allows some of Durie's water drainage to pass under the *113 railroad tracks and eventually into the water company reservoir. A northerly culvert is located north of Durie Estates and Lot 2 on the farm's westerly border about two-thirds of the way up that border.
The northerly culvert was constructed in the 1860s, is made of old original block construction, is in poor condition, and filled with silt and debris. It has not been rebuilt or maintained.
The approved drainage plan for Durie Estates provided that all storm water runoff would be piped into a five or six acre wetlands retention area located in the center of the development. Two pipes would then drain the water from the retention basin into ditches leading to the southerly and northerly culverts. The southerly ditch is on railroad property, but the northerly ditch is on farm property, running over the County and Borough sewer easements, and was depicted on the Durie plans as an existing "stagnant ditch."
The planning board had conditioned its approval of Durie Estates upon the requirement that Durie clear and grade the "stagnant ditch" to the northerly culvert, with the approval of the railroad. The Borough Engineer, at the time of the approval, did not realize that the ditch north of Lot 2, leading to the northerly culvert meandered between the railroad property and the farm. There is nothing in the record proving that the condition has been fulfilled and no one who testified could say the clearing and grading was done or that approval was obtained from the railroad, the farm, or the Hackensack Water Company.
In the spring of 1994, a stream of cascading water flowing from the southwestly corner flooded the farm. The farm maintains that the water was piped drainage water from Durie Estates, which should have gone into the "stagnant ditch." But after fifty feet onto farm property, according to defendant, the ditch ends and the water from Durie Estates can flow over the farm. According to the Borough, however, the ditch runs alongside the railroad tracks to the northerly culvert.
When the farm flooded in 1994, a contractor was on site donating soil. Defendant directed the contractor to drop the soil in the southwest corner of its property to block the flow of water allegedly containing roof and street runoff not suitable for organic farming purposes.
Shortly thereafter, the Borough Engineer wrote the farm explaining that the placement of fill on its easement caused "a hardship to the Borough and adjoining property owner(s) located to the south of [farm] property." The letter ordered defendant to "cease and desist in the placement of any more fill ... [and] remove the fill placed in this area that is blocking the natural drainage course located in this area." The letter further ordered defendant to "restore the ground to the natural grade over the ... easements ... [and] properly stabilize[] to the configuration that permitted runoff to flow in the existing ditch located at the base of the railroad embankment." There then ensued a period of charge and counter charge between the Borough and defendant. The Borough insisted that defendant improperly added fill over the Borough's easement, endangering its sewer system and the Durie Estates drainage. Moreover, the Borough claimed that defendant had added soil to railroad property and disrupted "the natural flow of storm water along the railroad tracks that had been in place since the railroad tracks were built many years ago." Defendant insisted that it had prevented its farm from being ruined by the contaminated water and that Druie Estates had precipitated the flood. The Farm further argued that the Borough's easement was a sewer easement, not a *114 storm water easement. Defendant did not remove the soil and the Borough took no further action.
Two years thereafter, in 1996, defendant placed a soil berm along the railroad embankment on its westerly border. Defendant also placed mulch, planted trees, and constructed a deer fence along the berm. Defendant explained that it built this berm to suppress weeds and to deter woodchucks, deer and other animals from eating its crops. In addition, defendant placed topsoil along its borders to store and conserve for future farm use. Defendant insisted that this berm had nothing to do with its actions two years previous in the southwest corner of its property. When the trial judge made his site visit, he observed that the farm "ha[d] been completely enclosed by embankments ..., [with] [t]he southerly boundary ... built up to approximately 20' [and] the embankment along the railroad right away ... [built to] approximately 10' ... in height."
In September 1998, the Borough sued defendant, certain individuals representing Durie Estates, and Conrail. Defendant answered, cross-claiming against the Durie defendants and counterclaiming against the Borough. Defendant unsuccessfully attempted to transfer the action to the Chancery Division, the Borough settled with Conrail, and defendant's counterclaim was dismissed.
The remaining dispute came to trial on May 13, 2002, eight years after defendant had added fill to the southwesterly corner of the farm. After several days of trial, the court rendered a written decision on May 29, 2002, ordering defendant "to remove such soil as necessary to allow the northerly flow of water from the Durie property and [L]ot # 2 so that it may enter the northerly culvert under the railroad, and ultimately flow ... into the reservoir located to the west."
After the trial court issued its decision, on June 14, 2002, defendant moved to vacate the court's decision and dismiss the complaint for lack of jurisdiction based on the Farm Act. Defendant argued that because the Farm Act was preeminent, the trial court lacked subject matter jurisdiction, and the court's actions must be vacated and the Borough's complaint dismissed for lack of jurisdiction. The court denied defendant's motion, and this appeal ensued.

II.
The Farm Act, as amended in 1998, utilizes strong language to preempt municipal land use authority over commercial farms. The Act was designed "to promote to the greatest extent practicable and feasible, the continuation of agriculture in the State of New Jersey while recognizing the potential conflicts among all lawful activities in the State." Senate Natural Res. and Agric. Comm. Statement, No. 854L. 1983, c. 31 (N.J.1998).
The Farm Act applies to any "commercial farm" in New Jersey, defined by the statute as "a farm management unit of no less than five acres producing agricultural or horticultural products worth $2,500 or more annually, and satisfying the eligibility criteria for differential property taxation pursuant to the `Farmland Assessment Act of 1964,' ... [N.J.S.A.] 54:4-23.1 et seq." N.J.S.A. 4:1C-3; see N.J.S.A. 54:4-23.1 to -23.23.
The Farm Act provides that a commercial farm "whose specific operation or practice ... constitute[s] a generally accepted agricultural operation or practice,... and which does not pose a direct threat to public health and safety may" perform various farming functions that may be considered annoying or a nuisance by other citizens. N.J.S.A. 4:1C-9.
*115 The Farm Act creates an "irrebuttable presumption"[1] that any activity of a commercial farm that is determined by the CAB "to constitute a generally accepted agricultural operation or practice [cannot] ... be deemed to otherwise invade or interfere with the use and enjoyment of any other land or property," provided the operation or practice "does not pose a direct threat to public health and safety." N.J.S.A. 4:1C-10.
The Farm Act renders its provisions preeminent to "any municipal or county ordinance, resolution, or regulation to the contrary," N.J.S.A. 4:1C-9, and in Twp. of Franklin v. Hollander, 172 N.J. 147, 796 A.2d 874 (2002), the Supreme Court found the Farm Act's provisions preeminent over a municipality exercising its powers under the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -112.
The dispute on appeal involves a municipality's efforts to enforce the nuisance laws and the law of surface waters, see Armstrong v. Francis Corp., 20 N.J. 320, 120 A.2d 4 (1956), and there is no municipal ordinance, resolution or regulation directly involved. Nevertheless, one of the legislative purposes of the Farm Act is the "protection of commercial farm operations from nuisance action[s]." N.J.S.A. 4:1C-2(e). The Farm Act specifically provides that a commercial farm's generally accepted agricultural practices that do not directly threaten the public health and safety shall not "constitute a public or private nuisance." N.J.S.A. 4:1C-10.

III.
The trial court raised but did not decide the question of whether defendant's non-profit farming operation could constitute a commercial farm. Instead, to reject the applicability of the Farm Act and award injunctive relief, the court specifically found that defendant's actions were "clearly unreasonable in light of the health and safety hazards that they posed." The court explained that defendant's action established "a breeding ground for mosquito infestation and [constituted] a danger for children because of deep water that the Court itself observed on a relatively dry period of time laying in the back of the properties of downstream owners."
In considering the parties' Farm Act arguments, we have concluded that the record reveals three disputed questions regarding (a) whether defendant is a commercial farm, (b) whether defendant's actions constituted farm practices, and (c) whether defendant's actions constituted a direct threat to the public health and safety. Our disagreement with the trial court's resolution finding a nuisance and granting injunctive relief against the farm is based upon two conclusions: first, the Farm Act establishes primary jurisdiction with the CAB for each of the disputed questions; and second, the court should not have proceeded to judgment when defendant's operation and practices could not clearly be excluded from the Farm Act. We explain why we have reached each of these conclusions.

1.
Our Supreme Court has held that under the Farm Act "the CAB and [State Agricultural Development Committee] SADC have primary jurisdiction over disputes between municipalities and commercial farms." Twp. of Franklin v. Hollander, supra, 172 N.J. at 151, 796 A.2d 874. The Farm Act establishes primary jurisdiction *116 by requiring that "[a]ny person aggrieved by the operation of a commercial farm shall file a complaint with the applicable [CAB] or the [SADC] in counties where no county board exists prior to filing any action in court." N.J.S.A. 4:1C-10.1(a) (emphasis added).[2]
Because the Farm Act establishes primary jurisdiction with the CAB or SADC, however, it does not deprive the court of subject matter jurisdiction. See Boldt v. Correspondence Mgmt., Inc., 320 N.J.Super. 74, 83, 726 A.2d 975 (App.Div. 1999). Primary jurisdiction recognizes that both the administrative agency and the courts have subject matter jurisdiction, but for policy reasons, the agency should exercise its jurisdiction first. Borough of Haledon v. Borough of N. Haledon, 358 N.J.Super. 289, 301-02, 817 A.2d 965 (App.Div.2003); Muise v. GPU, Inc., 332 N.J.Super. 140, 158-59, 753 A.2d 116 (App.Div.2000). Primary jurisdiction "comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." United States v. W. Pac. R.R. Co., 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126, 131 (1956).
Of the three disputed issues referenced above, we have previously held that the CAB or SADC must first under primary jurisdiction principles decide two of them, whether defendant's actions constituted farm practices and whether defendant's actions constituted a direct threat to the public health and safety. It is the CAB who must, in the first instance, make the decision whether the activity in question "constitutes a generally accepted agricultural operation or practice," N.J.S.A. 4:1C-10.1(c) and "whether and to what extent its jurisdiction extends to such allegations," Twp. of Franklin v. Hollander, 338 N.J.Super. 373, 394, 769 A.2d 427 (App.Div.2001), aff'd, 172 N.J. 147, 796 A.2d 874 (2002), not "the municipality or a court." Id. at 392, 769 A.2d 427. In addition, it is the CAB or SADC that must "determine ... whether the practices at issue present a `direct threat to public health and safety,'" id. at 394, 769 A.2d 427, and "the impact of such practices on the municipality." Id. at 376, 769 A.2d 427.
It is only the third issue, whether defendant is a commercial farm, which we have not previously addressed in light of the Farm Act's primary jurisdiction. Reaching this issue was unnecessary in Twp. of Franklin because the farm involved was clearly a commercial enterprise. In any event, we hold now that when a farming operation arguably meets the definition of a commercial farm under N.J.S.A. 4:1C-3, it is the CAB or SADC that must first decide whether the farm actually meets the definition. The agency is deprived of jurisdiction only when the operation clearly cannot meet the definition of a commercial farm under the Farm Act.
The Farm Act is silent as to whether this issue should be determined first by the agency. It is obvious, however, that determining whether particular operations are commercial farms can directly affect the scope of the Farm Act. By centralizing this determination in the agency, consistent application can be ensured. We feel *117 certain that this construction better fosters the legislative purpose of protecting commercial farming operations. Statutes must be read "`sensibly ... with the reason and purpose for the legislation controlling.' " Cesare v. Cesare, 154 N.J. 394, 405, 713 A.2d 390 (1998) (quoting Reisman v. Great Am. Recreation, Inc., 266 N.J.Super. 87, 96, 628 A.2d 801 (App.Div.), certif. denied, 134 N.J. 560, 636 A.2d 519 (1993)).
This construction is also in conformity with the pertinent regulations. When the CAB determines, under N.J.S.A. 4:1C-9, 10, whether a particular operation or practice is agriculturally generally accepted, the regulations require the farm owner or operator to provide proof to the CAB in the form of a certification that it meets the definition of a commercial farm. N.J.A.C. 2:76-2.3(b). When a complaint is filed involving an agricultural management practice, the CAB or SADC seeks proof from the farm that the "operation is a commercial farm." N.J.A.C. 2:76-2.10(a)-(b)(1), (c)(1)-(2).
We are, of course, not bound by an agency's interpretation of statutory intent. In re M.F., 169 N.J. 45, 56, 776 A.2d 780 (2001); Rider Ins. Co. v. First Trenton Co., 354 N.J.Super. 491, 499, 808 A.2d 143 (App.Div.2002). But we give great weight to regulations propounded by an agency charged with implementing the statute being construed. N.J. State League of Municipalities v. Dept. of Cmty. Affairs, 310 N.J.Super. 224, 233, 708 A.2d 708 (App. Div.1998), aff'd, 158 N.J. 211, 729 A.2d 21 (1999).
Thus, the regulations adopted by the agency and the need to foster consistent application of the statutory scheme support our holding that the Legislative intent of the Farm Act requires the CAB or SADC to determine first whether a particular operation is a commercial farm. Only after so concluding, must the agency proceed to determine whether the farm's actions constitute an accepted agricultural management practice or a direct threat to the health and safety of the public.

2.
Defendant's farm is more than five acres, assessed as a farm for tax purposes, and is "the largest provider of fresh organically grown vegetable[s] in the State of New Jersey." The fact that this produce is given away to charities to feed the poor would not seem determinative, provided the produce has an annual value in excess of $2,500. Thus, defendant's operation appears arguably in conformity with the Farm Act's definition of "commercial farm." N.J.S.A. 4:1C-3.
Closter argues that the farm wrongfully deposited fill on and around the farm property in 1994 when defendant acted to stop the flooding because, according to Closter, defendant filled a drainage course and continued to build a high berm around the farm throughout the later years further causing storm water runoff problems.
Under the Farm Act, however, a commercial farm may, among other specifically approved functions, "[p]roduce agricultural... crops, .... [r]eplenish soil nutrients and improve soil tilth; [c]ontrol pests, predators and disease of plants and animals;... install and maintain vegetative and terrain alterations and other physical facilities for water and soil conservation and surface water control in wetland areas." N.J.S.A. 4:1C-9.
Considering these statutorily permitted activities, we cannot conclude definitively that defendant's actions did not conform to recommended agricultural management practices or constitute generally accepted operations or practices. N.J.S.A. 4:1C-9. Defendant's actions might qualify as "agricultural management practices" under the *118 Farm Act. Twp. of Franklin v. Hollander, supra, 172 N.J. at 150, 796 A.2d 874. Consequently, primary jurisdiction requires that the agency's expertise be utilized to address this question.
Finally, Closter contends that defendant's actions pose a direct threat to public health and safety. These contentions, relating to mosquito breeding and attractive nuisances, appear somewhat speculative, were disputed, and remain within the primary jurisdiction of the CAB. Id. at 153, 796 A.2d 874. The Legislature intended that the CAB determine "whether the operation of a commercial farm implicates agricultural management practices, and, if so, whether those practices affect or threaten public health and safety." Id. at 150, 796 A.2d 874. Thus, the court should not have proceeded to judgment and should have respected the CAB's primary jurisdiction.

IV.
We are troubled by the fact that defendants waited to raise the jurisdiction issue until after the trial had been concluded. It is well established "that a court cannot hear a case as to which it lacks subject matter jurisdiction." Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 65, 389 A.2d 465 (1978). It is also well established that "subject matter jurisdiction cannot be conferred by waiver resulting from a party's failure to interpose a timely objection to the assumption of jurisdiction." Ibid. Unlike subject matter jurisdiction, however, it may be possible to waive primary jurisdiction.
Those courts that have addressed this issue are split. Some have held that the doctrine of primary jurisdiction, or as sometimes referred to the defense of primary jurisdiction, cannot be waived or at least is not waived by the parties' failure to raise it in the trial court or on appeal. E.g., MCI Telecommunications Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1112 (3d Cir.1995) (court has discretion to decide sua sponte whether doctrine applies); Atlantis Express, Inc. v. Standard Transp. Servs., 955 F.2d 529, 532 (8th Cir.1992) (well established that doctrine is not waived by failure of parties to present it in trial court or on appeal); Distrigas of Mass. Corp. v. Boston Gas Co., 693 F.2d 1113, 1117 (1st Cir.1982) (doctrine not waived by failure to raise in trial court or on appeal, since doctrine exists for proper distribution of power between judicial and administrative bodies and not for convenience of parties); Louisiana & Arkansas Ry. Co. v. Export Drum Co., 359 F.2d 311, 314 (5th Cir.1966) (doctrine not subject to waiver, it being a proper allocation of business between courts and administrative agencies); Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry., Co., 857 F.Supp. 838, 843 (D.N.M.1994) (doctrine can be invoked sua sponte by the court and thus its invocation cannot be waived); Bird v. Fortuna, 262 F.Supp. 24, 26 (D.Mass.1966) (doctrine not subject to waiver and if applicable court should invoke doctrine sua sponte); Travelers Ins. Co. v. Detroit Edison Co., 465 Mich. 185, 631 N.W.2d 733, 735 (2001) (doctrine can be raised whenever a dispute can more appropriately be resolved by the administrative agency with authority over such claims); Dist. of Columbia v. Thompson, 570 A.2d 277, 288 (D.C.App.1990), vacated in part on other grounds, 593 A.2d 621 (D.C.1991) (doctrine cannot be waived).
There are also numerous cases that hold the doctrine can be waived or forfeited. E.g., Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355, 367, 114 S.Ct. 855, 863, 127 L. Ed.2d 183, 192 (1994) (failure to brief primary jurisdiction resulted in waiving consideration of the doctrine); Baltimore & Ohio Chicago Terminal *119 R.R. Co. v. Wisconsin Cent. Ltd., 154 F.3d 404, 411 (7th Cir.1998), cert. denied, 526 U.S. 1019, 119 S.Ct. 1254, 143 L.Ed.2d 351 (1999) (doctrine not one of jurisdiction and is therefore waivable); Kendra Oil & Gas, Inc. v. Homco, Ltd., 879 F.2d 240-242 (7th Cir.1989) (doctrine merely involves question of timing and judicial efficiency); Segers v. Ind. Comm'n, 191 Ill.2d 421, 247 Ill.Dec. 433, 732 N.E.2d 488, 492-93 (2000) (doctrine involves question of timing, not judicial competence to hear a particular case so can be waived).
In this case, counsel for defendant explained that he did not plead in the answer any jurisdiction defense and waited until after three and one-half days of trial to raise the issue because he "didn't know about the Farm Act." Our decision in Twp. of Franklin, "was there, and probably [as counsel agreed, he] should have known about that Appellate Division case."
Normally, people, and especially counsel, are "presumed to know the law." Graham v. N.J. Real Estate Comm'n, 217 N.J.Super. 130, 138, 524 A.2d 1321 (App. Div.1987). Within the context of this case, however, we do not find that defendant has waived the primary jurisdiction of the CAB.
A waiver must be the intentional relinquishment of a known right. W. Jersey Title Co. v. Indus. Trust Co., 27 N.J. 144, 152-53, 141 A.2d 782 (1958). Waiver must occur by a "clear unequivocal and decisive act." Id. at 152, 141 A.2d 782. The circumstances must show clearly that while the party knew of the right, he or she abandoned the right either by design or indifference. See Merchs. Indem. Corp. of N.Y. v. Eggleston, 68 N.J.Super. 235, 254, 172 A.2d 206 (App.Div.1961), aff'd, 37 N.J. 114, 179 A.2d 505 (1962).
Considering the strong legislative purpose of the Farm Act, Senate Natural Res. and Agric. Comm. Statement, supra, No. 854L. 1983, c. 31, N.J.S.A. 4:1C-2(e), we elect not to presume that defendant's counsel must have known the law and waived primary jurisdiction by participating in the trial and allowing the judge to render his decision before raising the Farm Act preemption argument.
To ignore the expertise of the agricultural board in this matter would be inconsistent with the "statutory scheme" which vested the agency "with the authority to regulate [the] ... activity" it oversees. Muise, supra, 332 N.J.Super. at 160, 753 A.2d 116. We believe that the Farm Act mandates that those with agricultural expertise first analyze the challenged farm practice. The doctrine, within the context of this case, is not for the convenience of the parties, Distrigas of Mass. Corp., supra, 693 F.2d at 1117, but instead is to ensure consistent application of the Farm Act. See Travelers Ins. Co., supra, 631 N.W.2d at 741. Only by precluding waiver in this case can the alleged agricultural practices be properly considered as against the claims of nuisance and improper alteration of the surface water flow.
As the Supreme Court recognized, "[a]gricultural activity is not always pastoral. The potential for conflict between farming interests and public health and safety exists. Nevertheless, we repose trust and discretion in the agricultural boards to decide carefully future disputes on a case-by-case basis and to balance competing interests." Twp. of Franklin, supra, 172 N.J. at 153, 796 A.2d 874. If we were to construe counsel's inaction and trial participation as a waiver in this case, the legislative purpose of the Farm Act would be thwarted. This we decline to do.

V.
Accordingly, we vacate the trial court's orders and remand this matter to the court with instructions to request the CAB to address the issues of whether defendant *120 is a commercial farm under the Farm Act and whether the farm's actions were agricultural management practices, and if so, whether those practices directly affect or threaten public health and safety.
At oral argument, it was alleged that Bergen County has a CAB, but the parties were uncertain of its composition or staffing. Because a relatively full record has been developed and unreasonable delay should be discouraged, we suggest that the CAB utilize the current record as much as possible to reach its decision. If the CAB initially or the SADC upon appeal, however, determines that the record must be developed further for a proper determination, the agency may conduct further hearings as necessary, in accordance with the provisions of N.J.A.C. 2:76-2.10.
Accordingly, we vacate the trial court's orders and remand to the trial court for transfer to the CAB. It is only by laying the agency's final decision alongside Closter's allegations of nuisance and unreasonable interference with the flow of surface waters may the issues be revisited and properly decided in accordance with the Farm Act. Boldt, supra, 320 N.J.Super. at 85, 726 A.2d 975.
Besides contending that the trial court lacked jurisdiction, defendant also argued, in the alternative, that the court wrongfully excluded evidence, found facts not supported by the evidence, and misapplied the laws of nuisance and the laws regulating the discharge of storm water on low lying property. Our resolution, vacating the judge's orders and directing that the CAB be permitted to exercise its primary jurisdiction, renders moot all of defendant's other arguments regarding alleged trial errors.
Vacated and remanded.
NOTES
[1] An irrebuttable presumption can arise only in actions filed after the effective date of the 1998 amendment, July 2, 1998. (L. 1998, c. 48, § 3.) Closter filed its complaint in this case on July 8, 1998.
[2] Should the aggrieved party be unsatisfied with the CAB result, then an administrative appeal rests with the SADC pursuant to N.J.S.A. 4:1C-10.2, and after receiving a final agency determination, further appeal may be taken to this court pursuant to R. 2:2-3(a)(2). The Farm Act also provides that if no party appeals from the CAB decision to the SADC, the CAB decision is "binding." N.J.S.A. 4:1C-10.1(e).