999 A.2d 1182 (2010)
415 N.J. Super. 1
Melody CURZI, Plaintiff-Respondent/Cross-Appellant,
v.
Raymond L. RAUB, III, and Gail A. Raub, husband and wife, Defendants-Appellants/Cross-Respondents, and
E. Barbara Lorentz Farley, the Estate of Robert Farley, deceased, James Swick, Esq., with Power of Attorney for E. Barbara Lorentz Farley, James Swick, Esq., as Trustee for the Estate of Robert Farley, all Individually, Jointly and Severally, Defendants.
Dennis Losco and Patricia Losco, h/w, and Nicholas Tauriello and Caroline Tauriello, h/w, Plaintiffs, and
Sophie G. Hendershot and James L. Hendershot, William F. Wright and Rosalie Wright, h/w, Plaintiffs-Respondents/Cross-Appellants,
v.
Raymond L. Raub, III, and Gail A. Raub, Defendants-Appellants/Cross-Respondents.
Raymond L. Raub, III, and Gail A. Raub, husband and wife, Third-Party Plaintiffs,
v.
Melody Curzi, D. Scott Curzi, and Richard G. Hardison, Third-Party Defendants.
No. A-5380-06T1
Superior Court of New Jersey, Appellate Division.
Argued November 9, 2009.
Decided July 30, 2010.
*1185 William L. Handler argued the cause for appellants/cross-respondents (George R. and William L. Handler, attorneys; William L. Handler, of counsel and on the briefs).
D. Scott Curzi, Phillipsburg, argued the cause for respondents/cross-appellants Melody Curzi, Sophie G. and James L. Hendershot, and William F. and Rosalie Wright (Curzi Law Offices, attorneys; Mr. Curzi, on the briefs).
Eileen P. Kelly, Deputy Attorney General, argued the cause for amicus curiae State Agriculture Development Committee (Anne Milgram, Attorney General, attorney; Lewis A. Scheindlin, Assistant Attorney General, of counsel; Ms. Kelly, on the brief).
Before Judges LISA, BAXTER and ALVAREZ.
The opinion of the court was delivered by
LISA, P.J.A.D.
The primary issue in this appeal deals with jurisdiction under the Right to Farm Act (Act), N.J.S.A. 4:1C-1 to -10.4, in the context of a private nuisance claim. Defendants Raymond L. Raub, III (Raub) and his wife Gail A. Raub own a 34 acre farm straddling Harmony and Lopatcong Townships in Warren County. In addition to that property, Raub also conducts farming operations on about 120 contiguous acres he leases from the State.
Plaintiffs are five sets of homeowners who live adjacent to Raubs' farm, some in Harmony and some in Lopatcong. In two separate actions, which were consolidated in the trial court, plaintiffs asserted various claims against the Raubs, including nuisance claims related to farming activities. Plaintiffs alleged that Raub intentionally created these nuisances with the purpose to harass them. The Raubs moved to either dismiss these claims or transfer them to the Warren County Agriculture Development Board (Board) pursuant to N.J.S.A. 4:1C-10.1 a, which provides that "[a]ny person aggrieved by the operation of a commercial farm shall file a complaint with the applicable county agriculture development board ... prior to filing an action in court." The trial court agreed with plaintiffs that the nature of the Raubs' alleged intentional tortious conduct was clearly beyond the purview of the Act and should be decided by a jury. The court further reasoned that the nuisance claims "cannot be separately heard by the agricultural board in this case because they are intertwined into a larger dispute," referring to plaintiffs' other claims involving trespass, removal of trees on plaintiffs' properties, and the validity of an access easement to a portion of the Raubs' property. The court concluded that "[i]n the context of this larger dispute, it is clear that the basis for a cause of action for nuisance is clearly unrelated to agricultural practice." The court therefore denied the Raubs' motion.
A jury trial resulted in favorable verdicts for some plaintiffs on some claims. *1186 Included were compensatory damage awards of $10,000 each to the Hendershots and the Wrights for nuisance caused by Raubs' lining up of box trailers end-to-end along their property lines; the Wrights were also awarded $40,000 in punitive damages. Raub had presented evidence that he used the trailers for the storage of hay harvested from the adjoining field, that this was the only practical place to put the trailers, and that he did not put them there to harass his neighbors. The jury also awarded Curzi nominal damages of $500 for trespass, $20,000 compensatory damages for unauthorized removal of trees from her property, and $20,000 in punitive damages. The jury returned no cause verdicts on various other claims, including some pertaining to other conduct by Raub allegedly constituting intentional nuisance arising out of farming activities. Finally, the jury found that the disputed "Deed of Easement" created a valid right-of-way for Raub to access the portion of his property he was subdividing.[1]
In the months following the verdict: (1) the court denied the Raubs' motion to vacate the awards to the Hendershots and the Wrights for lack of jurisdiction (which the court treated as a motion for judgment notwithstanding the verdict); (2) the court conducted an abatement hearing regarding the trailers and ordered that Raub place them at least 100 feet from the Wright-Hendershot property line and screen them with six-foot evergreen trees at ten-foot centers; and (3) the court sua sponte, without prior notice to the parties and without a motion for remittitur having been made, reduced the Wright's punitive damage award from $40,000 to $20,000, and reduced Curzi's punitive damage award from $20,000 to $10,000.
During the trial court litigation, two proceedings were conducted by the Board regarding the trailers. The first was several months after the June 25, 2004 commencement of the litigation, but before Raubs' motion to dismiss or transfer the nuisance claims to the Board. Raub successfully sought a site-specific determination that his use of the trailers constituted an acceptable agricultural management practice. The second was to consider Lopatcong's summons charging that Raub's placement of the trailers constituted a setback violation. Hearings were held in the months preceding the jury trial of November 27 to December 20, 2006. The Board issued its dispositional resolution after the jury verdict but before the trial court addressed the Raubs' post-trial motion, conducted the abatement hearing, or reduced the punitive damage awards. The Board concluded that the trailers did not violate Lopatcong's setback ordinance and were a generally accepted agricultural practice. It allowed their continued use and placement near the property line. However, the Board limited the number of trailers to seven (from about fifteen that had been there) and required a buffer of three-foot evergreen trees on six-foot centers. In both proceedings, the Board found that the Raubs operated a "commercial farm" as defined in the Act.
The Raubs did not appeal from any aspect of the award to Curzi. They concede, as they did in the trial court, that the trespass, unauthorized tree removal, and easement claims are not implicated by the Act and the trial court had jurisdiction over those claims. Nor do they challenge the propriety of the jury awards of nominal, compensatory, and punitive (as reduced by the court) damages to Curzi. *1187 Indeed, they have paid Curzi the full amount of the judgment in her favor.
The Raubs appeal from the monetary awards to the Hendershots and the Wrights and the corresponding abatement order. They contend, as they have all along, that the court erred in refusing to transfer jurisdiction of plaintiffs' nuisance claims to the Board. We agree. An allegation of intentional nuisance is not sufficient to remove a private nuisance claim from the purview of the Act. Whether Raub's use and placement of the trailers constituted an acceptable agricultural practice was reasonably debatable and was a determination the Board has primary jurisdiction to make. We therefore vacate the money judgments in favor of the Wrights and the Hendershots and the abatement order. We remand to the trial court with the direction that an order be entered transferring these claims to the Board.
Curzi and the Wrights cross-appeal from the reduction of their punitive damages award. In light of our disposition of the Raubs' appeal, this issue is moot as to the Wrights. For the reasons we will discuss, we remand this issue to the trial court as to Curzi for reconsideration.
Curzi, the Wrights, and the Hendershots cross-appeal from the portion of the judgment, pursuant to the jury's verdict, finding a valid access easement for Raub to the portion of his property he was subdividing.[2] They argue that the jury's verdict is against the weight of the evidence and violates the ownership rights of private property owners. Our review of the record satisfies us that the jury's verdict on this issue is amply supported by the evidence. Cross-appellants' arguments on this point lack sufficient merit to warrant discussion in a written opinion, R. 2:11-3(1)(E), and we affirm on this portion of the cross-appeal.

I.
The Raubs bought the farm in 1997. Raub had grown up on a farm in Harmony and he worked on farms for many years before engaging in other business pursuits in 1979. Prior to 1997, the prior owners had farmed the land for many years with rather minimal activity, and apparently there were no problems with the neighbors. Until 1999, the prior owners continued farming the land, under a lease with the Raubs, as the Raubs refurbished the farmhouse and farm buildings, and began to make other modifications to the property in anticipation of their planned farming operations. During this time, Raub brought several trailers containing equipment, tools, materials, and the like onto the property. Over the next few years, Raub began purchasing more trailers because he expected to be "in the active hay business" and needed storage. Trailers were a cheaper alternative to a barn. They also had the benefit of mobility and could be moved to different locations depending on harvesting schedules. And they could be used to transport hay off the premises for sale. Raub began placing them along the Lopatcong property line, near the Hendershot and Wright property lines.
*1188 We will return to our discussion about the trailers, which are the subject of the appeal. However, some discussion about other farm-related nuisance claims and disputes is helpful to our analysis of the claim dealing with the trailers. As tensions escalated and neighbors made complaints to various local, county, and state officials, plaintiffs contend Raub began a course of retaliation.
Raub intended to raise beef cattle as part of his operation. He prepared a field adjacent to the Curzi property for that purpose in about 1999, much to Curzi's displeasure. Raub fenced in the area and would later keep as many as eighteen cattle in it. According to Curzi, Raub would throw hay out to feed them near the corner of her property, "so the cattle can eat, eat right there, defecate right there. So we have a nice aroma." The unpleasant smell, the noise, and the presence of the cattle so close to her property made her backyard and pool unusable. Curzi discontinued her prior practice of having picnics in her yard.
Nevertheless, Curzi and her neighbors, the Loscos, who also joined in this suit as plaintiffs, tried to hold a joint picnic on Labor Day Weekend in 2006. Raub chose to engage in open burning that day, which disrupted the picnic. Curzi reported this to local officials and learned that Raub had obtained the required permit. Raub, who engaged in open burning on several other occasions as well, admitted doing so on one day during that Labor Day weekend, but said he knew nothing of the picnic plans.
The Loscos also complained about the proximity of the cattle to their backyard and the fact that they were fed there. They also had a pool. They said the cattle drew flies which, along with the odor, made the use of their yard and pool very unpleasant.
We mention these incidents because they formed the basis of nuisance claims Curzi and the Loscos asserted against the Raubs, and the claims went to the jury. These claims were clearly related to Raub's farming operations. The jury rejected the claims, answering "NO" to the following interrogatory:
Did Plaintiff prove by a preponderance of the evidence that the conduct of Defendants in placing the cattle and burning of brush near the Curzi and Losco property lines was done intentionally to annoy and harass Plaintiffs and was an action taken out of spite with the purpose of creating a nuisance and was not a generally accepted agricultural operation or practice[?]

[Emphasis added.]
Another activity that provided the basis for a nuisance claim involved Raub's grading of an area in a manner that three sets of plaintiffs, the Wrights, the Hendershots, and the Tauriellos, claimed increased the run-off of storm water onto their properties. According to Raub, he "panned" that area preparatory to planting small grain there. This farm-related nuisance claim went to the jury, which rejected it, answering "NO" to the following interrogatory:
Did Plaintiff prove by a preponderance of the evidence that the conduct of Defendants in grading his property caused increased water run-off and was an intentional act to annoy and harass Plaintiffs Wright, Tauriello and Hendershot and was an action taken out of spite with the purpose of creating a nuisance and was not a generally accepted agricultural operation or practice[?]

[Emphasis added.]
Curzi and the Loscos also claimed that Raub trespassed on their properties and, without authorization, removed trees. Curzi prevailed on these claims. The Loscos did not.
*1189 We return now to the trailers. Raub owned about thirty trailers, which he placed at various locations from time to time. There was conflicting testimony about the frequency with which Raub would move the trailers. Plaintiffs contended that about eight trailers were lined up end-to-end along the Wright-Hendershot property line and remained in a stationary position for extended periods of time. Thus placed, the trailers created an unsightly wall, blocking the view of the residents. The doors were sometimes left open, creating noise as they swung in the breeze. Some trailers were painted with fluorescent or bright paint and some bore commercial logos. This arrangement created an eyesore.
The Wrights' son, William Wright, Jr., described a confrontation in which Raub threatened to place the trailers along the property line in retaliation for complaints the Wrights had made to various officials. William Wright, Jr. said this incident occurred in June 1999. Raub said it occurred in 2002. William Wright, Jr. said that Raub
came down in the yard and he was very upset with my father for I guess starting to go call the township and stuff like that and that's when he came down and threatened my dad ... he came down in the yard and came right up to my dad's face, stuck his finger in his face and said, exact words were, which I remember, Bill Wright, Bill Wright, I'm tired of your shit, you're pissing me off. If youI'm tired of your shit. If you piss me off I'll put these trailers end-to-end and that's what you will see for the rest of your life. And a few weeks later that's what we saw.
Raub categorically denied placing trailers near the Wright or Hendershot properties "to harass my neighbors." He insisted there was no "other place" to put them that would be practical. He described the sloping terrain, describing that field as "a continuous slope all the way down to the fence row" and therefore less suitable for parking trailers. He said the area near the property line was relatively flat and the most viable spot because the trailers were parallel parked along his farm road, in a low, shady spot where nothing would grow anyway. Raub also considered it sensible to use the perimeter of the fields for this purpose so as not to interfere with the area devoted to growing crops. John Fritts, who was Harmony's zoning official and Lopatcong's building inspector, testified that placement of the trailers end-to-end near the property line was likely done "to shuttle material [sic] hay from one into the other" and to place the trailers so as to maximize the land available for raising crops.
Paul M. Sterbenz, Lopatcong's municipal engineer, wrote to the Board on June 19, 2003 after responding to a complaint from Tauriello. He asked the Board to review Raub's placement of trailers along the neighbors' property lines. The letter recounted that Sterbenz had met with Raub on June 5, 2003, to determine whether he could adjust his operations to deal with the neighbors' concerns about light, air, and aesthetics, but that Raub had refused to move the trailers, claiming they were needed in that location to store hay produced in the adjacent field.
Sterbenz had made two suggestions to Raub: (1) move the trailers 40 feet back from the property line, allowing the setback distance as if the trailers were an "accessory structure" under the area's R-5 zoning; or (2) move the trailers to a location behind a hedgerow that would have hidden them from view. Sterbenz believed this would not involve major changes to what Raub was doing, because the "trailers wouldn't have to travel far" and would be "still adjacent to the field that he was *1190 harvesting hay in." Sterbenz considered it a "simple adjustment" that would alleviate the neighbors' concerns. Sterbenz said Raub "refused to do it" and took the position that Lopatcong "had no jurisdiction in this matter, that he was allowed to do this due to the Right to Farm Act. And that we had no business telling him what to do. He was very firm on that particular issue."
Sterbenz did not receive any response from the Board. At a 2005 meeting with Raub about his subdivision application, Sterbenz learned about the favorable ruling that Raub had received from the Board.
On cross-examination, Sterbenz agreed that the land began to slope upward not far from the property line where the trailers were located, so there probably would be a need for "cuts and fills" to grade a pad to park trailers forty feet back from the property line. Similar cutting or filling would have been needed to move the trailers to the other side of the driveway near the hedgerow. Sterbenz noted that they never reached the point of considering how to accomplish that, because Raub rejected the idea outright. Raub acknowledged rejecting Sterbenz's suggestion about relocating the trailers for the reasons we have stated.
Raub also acknowledged the confrontation with Mr. Wright. He said it occurred in the summer of 2002. His rendition did not include the threat described by William Wright, Jr. Raub's version was as follows:
Me and Mr. Wright had a discussion that become quite heated. In the summer of 2002, I come in and dropped a couple trailers in that lower field, not on the property line. Mr. Wright come up out of his yard and came over and asked me what I thought I was doing and that the neighbors were disturbed with me about what I was doing. It was a little bit heated discussion. Mr. Wright also complained about two vehicles that I had out front for sale, which at the time were my brother-in-law had passed away with cancer and my sister asked me if I would disperse of the vehicles for her, which I did.... I, basically, told Mr. Wright that that was my property and my intentions of what I was going to do and I didn't see really where it was any of his business. And the trailers were not on the property line. They were dropped out in the field. There was no trailers on that property line until late 2002.
The jury answered "YES" to the following interrogatory:
Did Plaintiff prove by a preponderance of the evidence that the conduct of Defendants in placing box trailers on Plaintiffs Wright and Hendershot's property line was done intentionally to annoy and harass Plaintiffs and was an action taken out of spite with the purpose of creating a nuisance and was not a generally accepted agricultural operation or practice[?]

[Emphasis added.]

II.
The issue before us is not whether, based on the trial evidence, Raub's placement of the trailers along the Wright-Hendershot property line constituted a nuisance. The issue is whether that determination should have been made in the Superior Court or through the administrative framework created by the Act. That framework vests primary jurisdiction for such determinations in the county agriculture development boards, Twp. of Franklin v. den Hollander, 172 N.J. 147, 150-51, 796 A.2d 874 (2002), subject to administrative review by the State Agriculture Development Committee, N.J.S.A. 4:1C-10.1 d, and judicial review in this court, N.J.S.A. 4:1C-10.1 e.
*1191 Before discussing why the trial court should have yielded to the primary jurisdiction of the Board, we provide an outline of the relevant provisions of the Act by which the Legislature directed that private nuisance claims should be addressed, at least initially, in the administrative forum. As amended in 1998, the Act "utilizes strong language to preempt municipal land use authority over commercial farms. The Act was designed `to promote to the greatest extent practicable and feasible, the continuation of agriculture in the State of New Jersey while recognizing the potential conflicts among all lawful activities in the State.'" Borough of Closter v. Abram Demaree Homestead, Inc., 365 N.J.Super. 338, 346, 839 A.2d 110 (App. Div.2004) (quoting Senate Natural Resources and Agriculture Committee Statement to Assembly Bill No. 854, L. 1983, c. 31 (1998)), certif. denied, 179 N.J. 372, 845 A.2d 1254 (2004). Thus, the Act "provides that a commercial farm `whose specific operation or practice ... constitute[s] a generally accepted agricultural operation or practice, ... and which does not pose a direct threat to public health and safety may' perform various farming functions that may be considered annoying or a nuisance by other citizens." Ibid. (quoting N.J.S.A. 4:1C-9). In listing the Act's purposes, the Legislature provided:
It is the express intention of this act to establish as the policy of this State the protection of commercial farm operations from nuisance action, where recognized methods and techniques of agricultural production are applied, while, at the same time, acknowledging the need to provide a proper balance among the varied and sometimes conflicting interests of all lawful activities in New Jersey.
[N.J.S.A. 4:1C-2 e.]
The Act contains an express listing of the types of agricultural practices in which an owner or operator of a commercial farm may engage, including: producing crops, forest products, and livestock and poultry; processing and packaging the farm's agricultural output; operating a farm market; replenishing soil; controlling pests, predators, and diseases; clearing land, including by open burning; and disposing of agricultural wastes. N.J.S.A. 4:1C-9 a to i. In addition to those listed practices, the State Agriculture Development Committee may promulgate rules to specify other permitted practices. N.J.S.A. 4:1C-9 j.
The Act provides that in all actions filed subsequent to the relevant effective date of the 1998 amendments,

there shall exist an irrebuttable presumption that no commercial agricultural operation, activity or structure which conforms to agricultural management practices recommended by the committee and adopted pursuant to the provisions of the "Administrative Procedure Act," P.L.1968, c. 410 (C.52:14B-1 et seq.), or whose specific operation or practice has been determined by the appropriate county board, or in a county where no county board exists, the [State Agricultural Development] [C]ommittee, to constitute a generally accepted agricultural operation or practice, and all relevant federal or State statutes or rules and regulations adopted pursuant thereto and which does not pose a direct threat to public health and safety, shall constitute a public or private nuisance, nor shall any such operation, activity or structure be deemed to otherwise invade or interfere with the use and enjoyment of any other land or property.

[N.J.S.A. 4:1C-10 (emphasis added).]
Notably, the 1983 version of the Act provided for a "rebuttable" presumption that an approved agricultural practice would not constitute a public or private nuisance. The 1998 amendment changed that to an "irrebuttable" presumption. *1192 The Committee Statement accompanying the amendment noted that this "irrebuttable presumption" standard "currently exists for agricultural operations in the farmland preservation program." Sponsor Statement to Assembly Bill No. 2014, at 10 (May 7, 1998), and Assembly Agriculture and Natural Resources Committee Statement to Assembly Bill No. 2014, at 2 (June 4, 1998). The Committee and sponsors were likely referring to N.J.S.A. 4:1C-26, a similar type of provision protecting from characterization as a nuisance agricultural activities undertaken on protected farmland.
N.J.S.A. 4:1C-10.1 further provides:

a. Any person aggrieved by the operation of a commercial farm shall file a complaint with the applicable county agriculture development board or the State Agriculture Development Committee in counties where no county board exists prior to filing an action in court.

b. In the event the dispute concerns activities that are addressed by an agricultural management practice recommended by the committee and adopted pursuant to the provisions of the "Administrative Procedure Act," P.L. 1968, c. 410 (C.52:14B-1 et seq.), the county board shall hold a public hearing and issue findings and recommendations within 60 days of the receipt of the complaint.
c. In the event the committee has not recommended an agricultural management practice concerning activities addressed by a complaint, the county board shall forward the complaint to the committee for a determination of whether the disputed agricultural operation constitutes a generally accepted agricultural operation or practice. Upon receipt of the complaint, the committee shall hold a public hearing and issue its decision, in writing, to the county board. The county board shall hold a public hearing and issue its findings and recommendations within 60 days of the receipt of the committee's decision.
d. Any person aggrieved by the decision of the county board shall appeal the decision to the committee within 10 days. The committee shall schedule a hearing and make a determination within 90 days of receipt of the petition for review.
e. The decision of the State Agriculture Development Committee shall be binding, subject to the right of appeal to the Appellate Division of the Superior Court. Any decision of a county agriculture development board that is not appealed shall be binding.

[Emphasis added.]
As we have stated, at about the time this litigation was initiated, Raub applied to the Board for a site-specific determination that his use of the trailers was an acceptable agricultural management practice. We have not been furnished with a record of the proceedings before the Board. However, at trial those proceedings were described in testimony. Raub presented Robert Resker, Warren County's director of land preservation, whose responsibilities include managing the Board's activities. He acknowledged that the Board had received Sterbenz's June 19, 2003 letter describing the neighbors' complaints about the trailers before Raub applied for a site-specific determination. He had also received a letter in March 2004 from Lopatcong's mayor stating that "over the course of last year there has been many complaints from our residents regarding the placement of trailers" on Raub's property. Resker and several Board members visited the site. Notice of the Board hearing, which we have not seen, was published in a local newspaper and sent to Lopatcong Township. However, it does not appear that the Board provided personal notice to *1193 the affected residents in Lopatcong, the Wrights and the Hendershots, and they did not attend the hearing.
Resker explained to the jury the general parameters of the Act and the authority and procedures of the Board. He described the Board's October 25, 2004 resolution determining that Raub's use of the trailers for the storage of hay and farm equipment was permitted as a generally accepted agricultural operation or practice. No one appealed that determination. Resker had not met with the affected neighbors, and, to his knowledge, neither had any Board members. Resker testified that in ruling on such applications the Board considers the potential impact on neighboring properties. He also said the Board offers a voluntary mediation process to help resolve conflicts between complainants and farmers.
This background shows the sequence of events. Residents complained to their municipal officials about the trailers. Those officials complained to the Board. Plaintiffs filed this action. Raub applied to the Board for a site-specific determination regarding the trailers. The Board acted. Its action was with knowledge that neighbors were complaining about the trailers, but those neighbors were not personally noticed of and did not participate in the Board's proceedings.
It is fair to assume that the Board heard no evidence about Raub's alleged threat to William Raub, Jr. that if the Wrights did not stop complaining about his farming operations he would line up the trailers in retaliation. Had the neighbors been involved in the Board's proceeding, either as objectors to Raub's application or as complainants, they could have aired their grievances, concerns, and suggested remedies. Mediation might have been helpful. With the full picture before it, the Board might well have reached a different result.
The jury heard the more expansive description of the events as presented by both sides. The information presented to the jury included the Board's determination, which statutorily constituted an "irrebuttable presumption" that Raub's placement of the trailers did not "constitute a... private nuisance" or "invade or interfere with the use and enjoyment of any other land or property." N.J.S.A. 4:1C-10. Further, because the Board's determination was not appealed, it was "binding." N.J.S.A. 4:1C-10.1 e. As to the latter consequence, although plaintiffs might have been aware of the Board's proceedings, they were not the complainants, see N.J.S.A. 4:1C-10.1 a, they were not provided personal notice, and they did not participate. Notwithstanding the evidence that some form of public notice was published, on the record before us we are hesitant to say that the Board's decision should be binding on plaintiffs.
In his instructions to the jury, the judge outlined the purposes of the Act, and then said this:
However, the Right to Farm Act was intended by the New Jersey legislature as a shield and not a sword. Therefore, if the defendant farmer in question constituted intentional wrongdoing in the sense of an act designed, intended or done specifically to injure, harass or annoy their neighbors, the Right to Farm Act will not operate as a shield for this type of conduct. You as the jury must decide whether the facts complained of by the plaintiffs, if they occurred, were acts intended by defendants to intentionally harass or agitate the plaintiffs, or if they are generally accepted agricultural practices protected under the act.
The Right to Farm Act provides an irrebuttable presumption, an assumption of the law that can in no way be contested, that no commercial or agricultural *1194 operation, activity or structure which conforms to generally accepted agricultural operations or practices and which does not pose a direct threat to public health and safety shall constitute a private, a public or private nuisance.
In this case, the Warren County Agricultural Development Board has determined that Mr. Raub's farm is a commercial farm. Therefore, for the plaintiffs to be successful in regard to their nuisance claims against the defendants, you must find that the activities engaged in by the defendants were clearly outside the scope of farming and did not constitute a generally accepted agricultural operation or practice. For example, conduct that would fall outside the scope of farming or any other generally accepted agricultural operation or practice would be conduct designed specifically to annoy or harass, action taken out of spite, or action with the purpose of creating a nuisance.
The jury was thus tasked with factfinding as to whether Raub's use and placement of the trailers were either an intentional and spiteful act of harassment or "generally accepted agricultural practices protected under the [A]ct." This formulation presents two problems. It assumes the two alternatives are mutually exclusive. More importantly, whether the conduct is a generally accepted agricultural practice is the very kind of inquiry and determination the Legislature has entrusted to an agency with expertise in the area.
Under the doctrine of primary jurisdiction, a "court declines original jurisdiction and refers to the appropriate body those issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." Borough of Haledon v. Borough of N. Haledon, 358 N.J.Super. 289, 301-02, 817 A.2d 965 (App.Div.2003) (quoting Muise v. GPU, Inc., 332 N.J.Super. 140, 158, 753 A.2d 116 (App.Div.2000) (quoting Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 269 n. 1, 390 A.2d 566 (1978))). Under primary jurisdiction, a case is properly before the court, but agency expertise is required to resolve the questions presented, as opposed to exhaustion principles, under which the case ought to have been brought before the administrative agency in the first place. Id. at 302, 817 A.2d 965. Primary jurisdiction serves two purposes: "to allow an agency to apply its expertise to questions which require interpretation of its regulations," and "to preserve uniformity in the interpretation and application of an agency's regulations." Ibid. A "court should defer to an agency's primary jurisdiction only if `to deny the agency's power to resolve the issues in question' would be inconsistent with the `statutory scheme' which vested the agency `with the authority to regulate [the] industry or activity' it oversees." Ibid. (quoting Muise, supra, 332 N.J.Super. at 160, 753 A.2d 116). Courts consider a four-prong test:
(1) Whether the matter at issue is within the conventional experience of judges;
(2) Whether the matter is peculiarly within the agency's discretion, or requires agency expertise;
(3) Whether inconsistent rulings might pose the danger of disrupting the expertise; and
(4) Whether prior application has been made to the agency.
[Ibid. (citing Boldt v. Correspondence Mgmt., Inc., 320 N.J.Super. 74, 85, 726 A.2d 975 (App.Div.1999)).]
Further, if "a claim presents some issues that are within an agency's special expertise and others which are not, proper course is for the court to refer the former to the agency, and then to apply the agency's findings or conclusions to its determination of the remaining issues." Id. at *1195 303, 753 A.2d 116 (quoting Muise, supra, 332 N.J.Super. at 161, 753 A.2d 116).
No one disputes that the use of trailers for storage of hay and farm equipment is an accepted agricultural practice. Whether placement of the trailers along the property line divested the activity of that protected status was properly a subject involving agricultural expertise. The topography of the surrounding area, the soil and other growing conditions of the property line area compared to other possible locations, the number of trailers reasonably needed relative to production from the adjoining field, and the impact on the productive growing area if the trailers were relocated are some readily identifiable issues that require agricultural expertise. These are not matters within the conventional experience of judges or jurors. Although plaintiffs had not made a prior application to the Board, an application dealing with the same subject matter had been made, with a different result. Application of the Muise factors weighs in favor of deferring to the agency's primary jurisdiction.
Another consideration sways us in that direction. The purpose and structure of the Act is to protect commercial farms from nuisance actions, as long as recognized and accepted agricultural techniques are used, while balancing that interest against other lawful interests, such as the right of residential neighbors to the use and enjoyment of their property. To achieve this purpose, the Legislature has immunized commercial farms from nuisance suits if they are using generally accepted agricultural practices. We expect that the tensions that give rise to such disputes will often be multifaceted, extend over some period of time, and involve mixed motives by the parties involved. The goal of the Act is that the public interest is best served by reconciling these disputes. The administrative framework has the capacity to provide reasonable solutions and eliminate, or significantly mitigate, the problem.
To this end, the agriculture boards and the State Committee may not evaluate the preferred agricultural practice in a vacuum. Because the Act is designed to balance farming practices against other lawful interests and activities, including those of adjoining property owners such as plaintiffs, these administrative bodies have an implied duty to consider the effect of the practice on those affected. Twp. of Franklin v. den Hollander, 338 N.J.Super. 373, 390-93, 769 A.2d 427 (App.Div.2001), aff'd, 172 N.J. 147, 796 A.2d 874 (2002). Although den Hollander dealt with balancing farming interests with enforcement of governmental interests, the rationale underpinning the decision applies with equal force to the private interests of adjoining residents. See also Borough of Closter v. Abram Demaree Homestead, Inc., 365 N.J.Super. 338, 348-52, 839 A.2d 110 (App.Div.), certif. denied, 179 N.J. 372, 845 A.2d 1254 (2004).
In den Hollander, the Court posed several examples in which a farmer's proposed use is proscribed by a local land use ordinance. If, for example, a farmer proposed construction of a barn sixty feet tall where the ordinance limit is fifty feet, "the farmer may be able to demonstrate a legitimate, agriculturally-based reason for needing the extra space." den Hollander, supra, 172 N.J. at 152-53, 796 A.2d 874. On the other hand, where a local ordinance does not interfere with the proffered farming use, "the zoning ordinance limitations ordinarily should be respected." Id. at 152, 796 A.2d 874. In either situation the determination is made by the agricultural board. The Court summed up its reasoning thusly:

*1196 The point of those examples is that a fact-sensitive inquiry will be essential in virtually every case. Agricultural boards will have to deal with an array of matters that are within the traditional jurisdiction of local authorities such as hours of operation, lighting, signage, ingress and egress, traffic flow, and parking, to name just a few. In those circumstances boards must take into account the interests of farmers, while simultaneously consider[ing] the extent of [the] use [of agricultural management practices] and consider the limitations imposed on such uses by a municipality.
. . . .
We recognize that the task before the agricultural boards is complex. Agricultural activity is not always pastoral. The potential for conflict between farming interests and public health and safety exists. Nevertheless, we repose trust and discretion in the agricultural boards to decide carefully future disputes on a case-by-case basis and to balance competing interests. We are confident that the boards will conduct those proceedings and reach their determinations in good faith, cognizant that the benchmark for those decisions is the understanding that government has an obligation to deal forthrightly and fairly with property owners and their neighbors.
[Id. at 153, 796 A.2d 874 (alteration in original) (citations and internal quotation marks omitted).]
The same logic applies when the competing interest is a private one, such as in this case. The same caveats also apply. Agricultural boards must conscientiously consider the impact of the proffered agricultural use on surrounding property owners. Id. at 150, 796 A.2d 874. Failure to do so is an abuse of discretion. Ibid. Boards shall provide notice to affected property owners when an application is made, as in this case, by the farmer. Id. at 151, 796 A.2d 874. Failure to do so in clear terms, describing with particularity the subject of the application and the consequences of the determination to be made, may deprive the determination of its binding effect on those individuals.[3] Boards must temper their determinations with due consideration of the impact on affected parties. Ibid. This requires a fair consideration of alternatives to the practice proffered by the farmer. If a reasonable alternative that will not significantly interfere with farming but will significantly mitigate adverse effects on neighbors is available, failure to order it would not constitute an appropriate exercise of discretion.
Finally, we note that the language of the Act is clear and unambiguous in requiring that any aggrieved person shall file a complaint with the county agricultural board "prior to filing an action in court." N.J.S.A. 4:1C-10.1 a. The Legislature could have provided, for example, as did the Connecticut Legislature in its right-to-farm act, an exception to the general provision that certain agricultural practices do not constitute a public or private nuisance: "The provisions of this section shall not apply whenever a nuisance results from negligence or wilful or reckless misconduct in the operation of any such agricultural or farming operation, place, establishment or facility, or any of its appurtenances." Conn. Gen.Stat. § 19a-341(c)(2010).
All fifty states have enacted right-to-farm acts, which are generally aimed at protecting agricultural producers and operations from nuisance actions. Harrison *1197 M. Pittman, Annotation, Validity, Construction, and Application of Right-to-Farm Acts, 8 A.L.R.6th 465, 480-81 (2005).
Of the many cases discussed in that article, only one dealt with allegations that an agricultural use was undertaken to "retaliate against and harass neighboring landowners." Id. at 523. That case involved egregious acts arising after the plaintiffs opposed the defendant's proposal to construct a motel on its property. Coty v. Ramsey Associates, 149 Vt. 451, 546 A.2d 196, cert. denied, 487 U.S. 1236, 108 S.Ct. 2903, 101 L.Ed.2d 936 (1988). The defendant imported truckloads of chicken manure, numerous junked automobiles, and over 100 pigs and cows, which animals were then mistreated and left dead on the property. Id. at 199-200. The trial court found that defendant "used the pretext of operating a farm to abuse and kill animals which itself had no purpose other than to intentionally annoy, upset and harass plaintiffs and to cause them economic injury." Id. at 200. The Vermont Supreme Court noted that the State had passed a right-to-farm act in 1981, "for the express purpose of shielding reasonable agricultural activities from nuisance lawsuits," but found that "[t]he activities at issue here are far removed from the sphere of the statutory protection." Id. at 202 n. 2.
The Vermont statute does not assign jurisdiction of right-to-farm issues to an administrative agency. See Vt. Stat. Ann. tit. 12, §§ 5751-54 (2010). Thus, no jurisdictional issue was implicated. The Vermont act creates a rebuttable presumption against nuisance, which may be rebutted by a showing, among other things, that the activity has a substantial adverse effect on the health, safety or welfare, or has a noxious and significant interference with the use and enjoyment of the neighboring property. Id. § 5753. The Vermont law is therefore less protective of farming activities than New Jersey's. The facts in Coty were so extreme that the activity was not bona fide farming but something created as a "pretext" of farming.
We need not decide whether in such an egregious case the administrative procedures in New Jersey could be bypassed. The facts before us consist of a bona fide farming operation of many years. The placement of trailers in connection with the operation was not clearly beyond the scope of the Act's protection. Whether it constituted a generally accepted agricultural practice under all the attendant circumstances was reasonably debatable and was required, under New Jersey's scheme, to be litigated in the first instance before the Board. If the Board, or the State Agriculture Development Committee (which could refer the matter to the Office of Administrative Law for a hearing by an administrative law judge, see N.J.S.A. 52:14B-9 and -10), or this court or the Supreme Court determine that the activity is not protected by the Act, then plaintiffs may proceed with their nuisance claim in Superior Court. A final determination adverse to plaintiffs will preclude plaintiffs from doing so. These are the results contemplated by the Act.

III.
We now address Curzi's cross-appeal from the trial court's sua sponte reduction of her punitive damage award from $20,000 to $10,000. The Raubs had not filed a motion for remittitur, and the judge did not notify the parties that he was considering reduction and afford them an opportunity to be heard.
The judge announced his decision on this issue as part of his written decision on the abatement issue, which had nothing to do with Curzi or the money damages the jury had awarded her several months earlier. In his decision, the judge said: "The Court now feels obligated to address the *1198 amount of punitive damages awarded by the jury." Citing N.J.S.A. 2A:15-5.12, and Baker v. National State Bank, 161 N.J. 220, 232, 736 A.2d 462 (1999), the judge noted that the trier of fact must consider the defendant's financial condition and "all relevant evidence" in setting the amount of punitive damages. The judge noted that N.J.S.A. 2A:15-5.14 a requires a trial judge to ascertain the reasonableness of a punitive damages award, in light of the deterrent and punishment purposes of such an award. Citing that statute, and also Tarr v. Bob Ciasulli's Mack Auto Mall, Inc., 390 N.J.Super. 557, 916 A.2d 484 (App.Div.2007), aff'd, 194 N.J. 212, 943 A.2d 866 (2008), the judge concluded that "[i]f necessary to satisfy the requirements of this section, the judge may reduce the amount or eliminate the award of punitive damages." He then stated:
During the punitive damages stage of the proceedings, Raub testified that he and his wife have income of approximately $50,000 a year from his lease of his former business and had farm losses of $1,259 in 2001, $13,511 in 2002, $26,163 in 2003 and $34,630 in 2005. There was no testimony on his net worth.
The Court feels that the award of $40,000 punitive damages to the plaintiff Wright is excessive and will reduce this award to $20,000.
Furthermore, the Court feels that the award of $20,000 punitive damages to the plaintiff Curzi is also excessive and will reduce that award to $10,000.
The Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, allows punitive damage awards to be entered for the purpose of punishing, and thereby deterring, a wrongdoer. Tarr, supra, 194 N.J. at 216, 943 A.2d 866. Regarding the amount of punitive damages that may be awarded, N.J.S.A. 2A:15-5.12 provides:
b. In determining whether punitive damages are to be awarded, the trier of fact shall consider all relevant evidence, including but not limited to, the following:
(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
(2) The defendant's awareness of reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
(4) The duration of the conduct or any concealment of it by the defendant.
c. If the trier of fact determines that punitive damages should be awarded, the trier of fact shall then determine the amount of those damages. In making that determination, the trier of fact shall consider all relevant evidence, including, but not limited to, the following:
(1) All relevant evidence relating to the factors set forth in subsection b. of this section;
(2) The profitability of the misconduct to the defendant;
(3) When the misconduct was terminated; and
(4) The financial condition of the defendant.
N.J.S.A. 2A:15-5.14 a further provides:
Before entering judgment for an award of punitive damages, the trial judge shall ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and to deter that defendant from repeating such conduct. If necessary to satisfy the requirements of this section, the judge may reduce the amount of or eliminate the award of punitive damages.
*1199 With certain exceptions not relevant here, the Act further provides: "No defendant shall be liable for punitive damages in any action in an amount in excess of five times the liability of that defendant for compensatory damages or $350,000, whichever is greater." N.J.S.A. 2A:15-5.14 b.
In Baker, supra, 161 N.J. at 231, 736 A.2d 462, the Court considered a similar circumstance in which the trial judge provided little or no reasoning in addressing the propriety of the amount of a punitive award:
In this case we find that compliance with the substantive standards of BMW v. Gore was inadequately addressed by the trial court. At the motion for a new trial, the trial judge simply stated that "[a]warding $4 million in punitive damages against a $400 million entity does not offend the conscience of this court, especially considering tax ramifications." In the interests of justice, we remand the matter to the Law Division to reconsider and apply the standards of BMW v. Gore. The trial court should assess whether the award was either appropriate in light of "the degree of reprehensibility of the [wrongful conduct,] the disparity between the harm or potential harm [suffered by the plaintiff] and the plaintiff's punitive damages award[,] and the difference between this remedy and the civil penalties authorized or imposed in comparable cases," BMW v. Gore, supra, 517 U.S. at 575, 116 S.Ct. at 1598-99, 134 L.Ed.2d at 826, or whether the award reflects prejudice, passion, or mistake warranting a new trial on the amount of punitive damages.
[Alterations in original.]
We first note that the trial judge possessed the authority to reduce the judgment amounts notwithstanding that the Raubs had not made a timely motion for remittitur. N.J.S.A. 2A:15-5.14 a gives the judge an affirmative obligation to see that a punitive damages award is reasonable, and the only time constraint is that the obligation be carried out "[b]efore entering judgment for an award of punitive damages." However, before the judge exercised the authority, he had an obligation to inform the parties he was considering whether the amount was reasonable and justified. Due process requires that the parties be placed on notice of the issue and given an opportunity to be heard.
Because the judge's statement of reasons was inadequate, we remand for reconsideration of this issue. We are mindful that the factual situation in Baker was very different from that in this case and finding comparable cases will be difficult or impossible. Nevertheless, a substantive expression of the judge's reasoning is warranted. We do not suggest what the outcome on this reconsidered issue should be, but order that it be supported by an appropriate statement of reasons.
Affirmed in part; vacated and remanded in part.
NOTES
[1] The proposed subdivision was for the purpose of providing a homesite for the Raubs' daughter. The validity of the subdivision is the subject of a separate appeal under Docket No. A-0469-07. We are filing our unpublished opinion in that case simultaneously with this opinion.
[2] The jury answered affirmatively the following interrogatory: "Do you find that the Deed of Easement created a right-of-way for Defendant Raub to access the newly subdivided lot?" The final judgment orders that, except as otherwise stated, "the jury returned a verdict of no cause for action as to all other complaints brought by the plaintiffs." We deem this a final judgment of no cause of action on Curzi's claim seeking a declaration that "said right-of-way [is] null and void." Although the notice of cross-appeal states that the Wrights and the Hendershots, as well as Curzi, cross-appeal on this issue, the pleadings indicate that only Curzi sought this relief.
[3] The issue is not squarely presented and we do not decide in this case whether personal notice is required in circumstances such as these, or whether published notice is adequate.